Kavita Vicky TARNEJA, Respondent,

v.

Kailash C. TARNEJA, Appellant.

No. 26421.

Missouri Court of Appeals,
Southern District,
Division Two.

June 15, 2005.

M. Douglas Harpool, Kristoffer R. Barefield, Lathrop & Gage, L.C., Springfield, for appellant.

Mark J. Millsap, J. Matthew Miller, Baird, Lightner & Millsap, P.C., Springfield, for respondent.

ROBERT S. BARNEY, Judge.

Appellant Kailash C. Tarneja ("Husband") appeals the judgment of the Circuit Court of Greene County, Missouri, dissolving his twenty-six year marriage to Respondent Kavita Vicky Tarneja ("Wife"). Husband raises four points of trial court error challenging the trial court's valuation and characterization of Husband's interest in his medical practice; the valuation by the trial court of an investment account which Husband maintains was not based on the "most current available balance;" the trial court's purported use of incorrect values for certain investment accounts awarded to Wife which created a purportedly unequal division of property; and, the trial court's award of maintenance to Wife. We affirm the judgment in all respects save for the trial court's maintenance award which we reverse. We remand the matter of maintenance to the trial court for further proceedings.[1]

The standard for reviewing a decree of dissolution is the same as in any court-tried action. *Bullard v. Bullard*, 929 S.W.2d 942, 944 (Mo.App.1996). The decree must be affirmed unless it is unsupported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).[2] "We do not retry the case, rather we accept as true the evidence and reasonable inferences therefrom in the light most favorable to the prevailing party and disregard contradictory evidence." *McCallum v. McCallum*, 128 S.W.3d 62, 65 (Mo.App.2003). Additionally, we defer to the trial court's determinations of credibility in making our review. *In re Marriage of Colley*, 984 S.W.2d 163, 166 (Mo.App. 1998).

The record reveals that the parties were married as part of an arranged marriage in New Delhi, India, on April 26, 1978. Husband is a board certified radiologist who attended medical school in India. Wife testified that she had obtained a "bachelor's degree and a teacher's training degree from India" prior to the parties moving to the United States in late 1978. Once the parties were residents of the United States, Husband began practicing medicine and Wife worked as a homemaker and as a part-time substitute teacher.[3]

On January 9, 2001, Wife filed a petition for dissolution of marriage. The trial court granted Wife's petition for dissolution of marriage and dissolved the parties' marriage. In its division of marital property, the trial court awarded Wife properties worth $1,520,792.00 and Husband was awarded properties valued at $1,466,403.72, inclusive of his interest in

---

1. Unless otherwise stated, all rule references are to Missouri Court Rules (2005) and all statutory references are to RSMo 2000.

2. *Murphy* interpreted the provisions of Rule 73.01(c). The provisions of that Rule now appear in essentially the same form in Rule 84.13(d).

3. The parties have two children, Ankur Tarneja, born November 3, 1981, and Neel Tarneja, born October 26, 1982. There are no issues in this appeal relating either to custody or child support.

his medical practice. Additionally, the judgment, *inter alia,* awarded Wife periodic modifiable maintenance in the amount of $6,500.00 per month; ordered Husband to pay the bulk of the marital debt; required each party to pay his or her own attorney's fees; and, ordered Husband to pay all expenses incurred by one of the parties' sons while he completed college. Husband's appeal followed.

■ In his first point on appeal, Husband maintains the trial court erred in valuing his interest in his medical practice at $433,863.00. According to Husband, the trial court's valuation was erroneous in that it included certain property belonging to his business partner and, therefore, his interest was overstated by $154,352.50. Further, he argues that said property was mischaracterized as marital property.

■ We begin our analysis by noting that the "trial court has broad discretion to identify marital property." *N.M.O. v. D.P.O.,* 115 S.W.3d 854, 859 (Mo.App. 2003). "If the evidence supports the trial court's classification, we will not find error in the trial court's decision." *Id.* Additionally, we observe that "[a] trial court is prohibited from entering a valuation of marital property not supported by any evidence at trial, but the trial court, nonetheless, enjoys broad discretion in valuing marital property." *Kirkham v. Kirkham,* 975 S.W.2d 500, 505 (Mo.App.1998). "When the trial court's valuation of property is within the range of conflicting evidence of value offered at trial, the court acts within its discretion to resolve conflicts in evidence." *Taylor v. Taylor,* 25 S.W.3d 634, 644 (Mo.App.2000). "The trial court is entitled to believe or disbelieve the testimony of either party concerning the valuation of marital property in a dissolution proceeding, and can disbelieve expert testimony." *Wofford v. Wofford,* 991 S.W.2d 194, 200 (Mo.App.1999).

■ "In a dissolution proceeding, the object of any valuation of a business is, of course, to determine its fair market value for purpose of application of the equitable distribution rules to arrive at a fair property division." *Thill v. Thill,* 26 S.W.3d 199, 203 (Mo.App.2000). " 'The judicial determination of value must be an informed judgment, but fair 'value' is not susceptible of determination by any precise mathematical computation.' " *Id.* (quoting *Flarsheim v. Twenty Five Thirty Two Broadway Corp.,* 432 S.W.2d 245, 255 (Mo.1968)). No one formula or method of determining value is binding or conclusive. *Miranda v. Miranda,* 596 S.W.2d 61, 65 (Mo.App.1980). "Generally, therefore, the trial court can accept the opinion of one expert as to value over another and can prefer one method of valuation over competing methods based on the particular facts of the case and the circumstances of the corporate entity involved." *Thill,* 26 S.W.3d at 203 (quoting *Flarsheim,* 432 S.W.2d at 255).

In the present matter, the record reveals the parties and their children moved to West Plains, Missouri, in 1983. Husband established a radiology practice in conjunction with the local hospital, Ozark Medical Center, whereby he was to be the exclusive provider of radiological services to the hospital. Thereafter, Husband formed West Plains Imaging and Associates, Inc. ("WPIA") and became the sole shareholder of that corporation. Husband used WPIA as a billing entity through which his medical practice operated.

In 1987, due to an increased workload, Husband hired Dr. Rob Armstrong ("Armstrong") to provide radiology services for WPIA. Thereafter, Husband and Armstrong entered into an oral agreement whereby they would essentially split the

profits of the practice equally, after payment of joint overhead expenses.

The aforementioned agreement between Husband and Armstrong remained in effect until in the midst of Husband's dissolution of marriage proceedings Husband and Armstrong formed West Plains Imaging, L.L.C. ("WPI") on January 28, 2003, although the terms of the agreement were not to go into effect until July 1, 2003.

Under the WPI agreement, all bank accounts, accounts receivable, equipment, and office furnishings were transferred from WPIA to WPI and Armstrong was given a one-half ownership interest in WPI.

At trial,[4] Cheryl Ward ("Ward"), the office manager for both WPIA and WPI, testified on May 6, 2003, that Husband owns "one hundred percent" of WPIA. She stated that she pays out of the WPIA accounts various personal bills relating to both Husband and Wife, together with Husband's professional expenses such as malpractice insurance and continuing education fees. Ward stated that Husband does not get a monthly check and instead "draws money throughout the month." Husband's half of what is left over at the end of the month once expenses are paid "stays in the corporation" of which he "is the sole owner." Ward testified that if there was extra money remaining in the account after the expenses were paid, she transferred these funds to the Salomon Smith Barney account ("the SSB corporate account"), which is also in the name of WPIA. She stated that the SSB corporate account is "where [Husband] keeps some of his money that he didn't need to take on a monthly basis as income."

Under the agreement with Armstrong that was in effect at the time of her testimony, Ward stated that in calculating how Armstrong is paid, she takes "the income for the month, subtract[s] the expenses, and the balance is divided equally between [Husband] and Dr. Armstrong. There are some adjustments that are deducted from Dr. Armstrong's for things like depreciation and stuff. And then the net of that is the check that is paid to him monthly." Armstrong is "compensated by an equal share after expenses are deducted from the month's income." She testified that Husband's retirement plan is "through Smith Barney," but that "Armstrong is not part of the corporate plan at all" and acknowledged that Armstrong "did not receive any withdrawal or withholding from his salary for retirement or 401K purposes."

In discussing the recent formation of WPI, Ward stated that Husband and Armstrong each own half of that business and that their agreement relating to WPI was to go into effect on July 1, 2003. Significantly, she stated that WPI had no assets and she was unaware as to how the assets of WPIA would be transferred into the new company.

Alan Rank ("Rank"), a financial consultant with Salomon Smith Barney, testified that about once a month he would receive checks from WPIA to deposit into the SSB corporate account and that the account was used to "accumulate the funds for future transfer [to the retirement accounts] ... and as funds accumulated, purchases of various common stocks and mutual funds were made with the excess balance." He testified that there would be certain fees assessed if the SSB corporate account was ordered to be liquidated. Further, he testified that as of March 30, 2003, the SSB corporate account held by his corporation had a balance of

---

4. The dissolution action was tried to the court on May 6–7, 2003; August 14–15, 2003; and, January 6, 2004, with final judgment being entered by the trial court on June 23, 2004.

$462,925.80, but the balance of the account fluctuated periodically.

Ken Schultz ("Schultz"), Husband's accountant, testified that Husband's "50 percent split of the corporate earnings from [WPIA] ... are retained in the corporation" because he "owns 100 percent of the corporation." He also acknowledged that Armstrong's share of the profits are reflected in his form 1099 as an independent contractor "with no deductions for work-related expenses unlike [Husband's] whose W-2 reflects gross income minus the deductions for work-related expenses...." Schultz also noted that Armstrong received monthly draws based upon profitability and in turn, Armstrong's individual "corporation will then have professional expenses that he will have to deduct on his corporation to derive at his own taxability."

Schultz also testified that a promissory note in the amount of $375,678.00 is owed to Husband from WPIA and represented the amount of Husband's earnings retained by WPIA and reinvested in the corporation. Further, he acknowledged that all of the WPIA assets are owned by Husband. He noted that he did not perform an actual business valuation of either WPIA or WPI; instead he "valued what the tax effect would be if the company were to be liquidated." Based on the foregoing, it was his belief that Husband's equity in WPIA had a book value of $165,000.00, which he discounted to a present value of $123,702.00.

Larry Ellison ("Ellison"), Wife's expert witness and an accountant, testified that the WPIA tax returns reveal that Husband is the sole shareholder and officer of that company. In valuing Husband's medical practice, Ellison considered WPIA and WPI as the same entity because he had no information as to whether the assets of the two companies differed, and he had no information about the transfer of assets between the two entities. Based on Ellison's calculations, Husband's medical practice was valued at $802,477.00. This amount included the SSB corporate account valued as of July of 2003 in the amount of $493,772.00; accounts receivable valued at $147,000.00; fixtures and equipment valued at $75,000.00; the WPIA checking account at Wood and Huston Bank valued at $34,842.00; and, a recently opened WPI checking account at Wood and Huston Bank valued at $51,863.00. Ellison then subtracted $368,614.00, the amount of the note payable to Husband for wages retained by WPIA, to arrive at a final value of $433,863.00. In its findings, the trial court found that the assets of WPIA/WPI were marital property and accepted Ellison's valuation of the medical practice.[5]

Here, "[t]he court's objective was to find the true or actual value of Husband's marital interest in the medical practice." *D.K.H. v. L.R.G.*, 102 S.W.3d 93, 102 (Mo. App.2003). The record shows that from 1983 until midway through the trial in this matter, when WPI was established, Husband and Armstrong operated WPIA based on an agreement that provided for an equal division of the corporation's profits; however, the record is clear that throughout that time Husband *owned one hundred percent of WPIA, was the sole shareholder, was the sole owner of the corporation's assets, and was the sole manager of the corporation's funds.* Armstrong was specifically classified as and treated as an independent contractor and he had his own, separate corporation through which his earnings were pro-

---

**5.** In its judgment, the trial court awarded the amount of $368,614.00, the amount of the promissory note, to Husband as marital property.

cessed. Clearly, Armstrong had no ownership or corporate interest in WPIA. It was not until this matter had already been through several days of trial that Armstrong and Husband actually began operating as WPI under their written contractual agreement. The office manager, Ward, testified that WPI had no assets and she was unsure if the assets of WPIA were transferred into WPI. She went on to state that "[e]verything was carried over [to WPI], or put in as far as day-to-day operations of the office equipment and so forth. There [i]s no difference . . . as far as the paper trail. . . ." She stated that the only change under the WPI operating agreement is "how the income is disbursed" because the corporation hired another doctor. She also testified that WPIA is still in existence in some form.

We cannot say the trial court erred in determining that all of the assets of WPIA were owned by Husband and were marital property, particularly considering the absence of consideration flowing from WPI to WPIA for the latter's transfer of assets to WPI. All assets and monies accumulated by WPIA were accumulated during the parties' marriage and Husband cannot rebut the presumption that his medical practice was not subject to division under section 452.330. Husband's medical practice was correctly classified as marital property by the trial court.

All income or property acquired during a marriage is presumed to be marital property. § 452.330.3; *see also Heslop v. Heslop*, 967 S.W.2d 249, 252 n. 2 (Mo.App. 1998). That presumption may only be rebutted upon presentation of clear and compelling evidence that the property is non-marital in nature. § 452.330.3; *see Coughlin v. Coughlin*, 823 S.W.2d 73, 75 (Mo. App.1991). " 'Once property is classified as marital, the factors listed in § 452.330 apply in dividing the property.' " *Hall v.*

*Hall*, 118 S.W.3d 252, 261 (Mo.App.2003) (quoting *Keller v. Keller*, 18 S.W.3d 589, 600 (Mo.App.2000)).

As far as the trial court's valuation of WPIA/WPI, when there is conflicting evidence regarding valuation of property, this Court defers to the trial court's resolution of the conflict. *McGowan v. McGowan*, 43 S.W.3d 857, 864 (Mo.App.2001). The trial court here accepted the valuations set forth by Wife's expert and the trial court could properly have disbelieved the valuation testimony of Husband's expert. *In re Marriage of Smith*, 785 S.W.2d 764, 767 (Mo.App.1990). There was substantial evidence presented supporting the trial court's determination that Husband's medical practice was marital property. *See Pruitt v. Pruitt*, 94 S.W.3d 429, 434 (Mo. App.2003). Additionally, there was substantial evidence presented supporting the trial court's valuation of the assets relating to Husband's medical practice. *D.K.H.*, 102 S.W.3d at 102. Point One is denied.

■ Husband's second point maintains the trial court erred in overstating the value of his interest in the medical practice because the trial court did not use "the most current available balance" for the SSB corporate account. Husband's complaint is that the trial court erroneously used the amount of $493,772.00, which was the balance in the SSB corporate account as of July of 2003, as opposed to the amount of $401,265.00, which was the balance in the account as of November 30, 2003.

■ "Value is a determination of fact by the trial court, to which we give great deference." *Thill*, 26 S.W.3d at 203. The court may receive any relevant evidence on the issue of value. *D.K.H.*, 102 S.W.3d at 102. It is widely held that valuation of property should be reasonably proximate to the date the division of prop-

erty is to be effective. *In re Marriage of Below,* 8 S.W.3d 233, 236 (Mo.App.1999).

The present matter was tried in court on May 6–7, 2003; August 14–15, 2003; and, January 6, 2004, with the entry of a final judgment by the trial court on June 23, 2004. The record reveals that the beginning balance for 2003 of the account at issue was $495,879.16. Rank stated that as of March 30, 2003, the balance in the account was $462,925.80. Schultz testified that the same account had a "book value" in March of 2003 of $462,302.00. Ellison testified that the account had a balance in July of 2003 of $493,772.00. Yet, the November 1 through November 30, 2003, statement for the account at issue shows that the account had a balance of $401,204.83.[6]

■ There was testimony from Rank that the fluctuating balance in all of the Salomon Smith Barney accounts was normal based on the fact that they were diversified investment accounts. The trial court chose to believe Ellison's valuation of the medical practice and likewise adopted the July of 2003 amount detailed by Ellison.[7] Where there is conflicting evidence regarding valuation of property, this Court defers to the trial court's resolution of the conflict. *McGowan,* 43 S.W.3d at 864. This is a matter of witness credibility and in such instances the trial court is free to believe or disbelieve the testimony of witnesses. *In re Marriage of Smith,* 785 S.W.2d at 767. Given that this case was

tried over a period of almost a year and there was conflicting evidence relating to the amount of money in the account, we cannot convict the trial court of error in choosing to utilize the July of 2003 account balance.[8] Point Two is denied.

■ In his third point on appeal, Husband asserts the trial court erred in its division of marital property in that it understated the value of certain investment accounts awarded to Wife, which further exacerbated the inequality of the award of marital property. Husband contends that on page eight of its findings of fact the trial court set out that the Salomon Smith Barney account 736–46699 ("the special account") had a balance of $118,870.00, but in its Exhibit B attached to its "Judgment and Decree of Dissolution of Marriage" it valued the same account at $111,870.00. Further, Husband contends that on page eight of its findings the trial court valued Wife's Salomon Smith Barney IRA account at $73,759.00, yet in Exhibit B it valued it at $72,759.00.

■ As stated previously, a trial court is " 'prohibited from entering a valuation of property not supported by any evidence at trial.' " *Taylor,* 25 S.W.3d at 644 (quoting *Lewis v. Lewis,* 978 S.W.2d 64, 66 (Mo. App.1998)). "Value is a determination of fact by the trial court, to which we give great deference." *Thill,* 26 S.W.3d at 203.

Here, the record reveals that the special account had a value of $111,230.69 as of July 25, 2003. The same account had a

---

6. The same statement reflects that there had been withdrawals totaling $112,275.00 during that year.

7. We note that Husband controlled the account at issue, but was unable to detail all of the various withdrawals from that particular account, and could not explain why the value of the account fluctuated between July of 2003 and November of 2003.

8. The issue in this point relied on arises in no small part because of delays attendant to the trial of the instant litigation. As previously set out, trial to the court took place during three, separate periods of time over the course of eight months, with a final judgment entered some thirteen months after the commencement of trial. It is this Court's view that this practice is unfair to the litigants and is not encouraged.

value of $111,892.36 on November 30, 2003. Accordingly, the value of $111,870.00 referred to in the trial court's judgment was well "within the range of conflicting evidence of value offered at trial" and the trial court did not abuse its discretion in utilizing such a number. *Taylor*, 25 S.W.3d at 644. Likewise, we discern that Wife's IRA account was also "within the range of conflicting evidence of value offered at trial." *Id.*

It should also be noted that the trial court did not set out that the parties were entitled to an "equal" division of all marital properties. Section 452.330 requires a fair and equitable division of marital property given the individual circumstances of the case, but does not require an equal division. *Ward*, 955 S.W.2d at 19. Point Three is denied.

■ Turning to Husband's final point, Husband asserts the trial court erred in awarding periodic modifiable maintenance to Wife in the amount of $6,500.00, per month because such award was unsupported by the evidence and was against the weight of the evidence.[9] Husband maintains the trial court failed to "impute sufficient income to [Wife] for full-time, post-dissolution employment;" "ignored the standard of living of the parties during marriage;" and "underestimated income [Wife] will receive from substantial assets awarded to her in the division of marital property." As to this latter, third subpoint in particular, Husband argues the trial court erred in its award of maintenance because "there is no indication from the record or from the trial court's judgment that potential income from the IRA accounts awarded Wife was considered [by the trial court] in determining the maintenance award." This latter sub-point has

merit and compels a reversal of the award of maintenance to Wife.

■ We note that a "maintenance award is 'aimed at closing the gap between the income of the spouse who seeks maintenance and that spouse's monthly expenses.'" *N.M.O. v. D.P.O.*, 115 S.W.3d 854, 857 (Mo.App.2003) (quoting *In re Marriage of Zavadil*, 806 S.W.2d 506, 512 (Mo.App.1991)). " 'Within the confines of the law and the evidence, the trial court has broad discretion in awarding maintenance.'" *Myers v. Myers*, 47 S.W.3d 403, 409 (Mo.App.2001) (quoting *In re Marriage of Thompson*, 24 S.W.3d 751, 754 (Mo.App.2000)). The determination of whether to award maintenance under section 452.335.1 is a two-step procedure. *Crews v. Crews*, 949 S.W.2d 659, 666 (Mo. App.1997). In the first step, section 452.335.1 requires the trial court to find that: (1) the party seeking maintenance lacks sufficient property, including marital property apportioned to that spouse, to provide for his or her reasonable needs; and (2) the party seeking maintenance is unable to support herself through appropriate employment. *Id.; see also Kirkwood v. Kirkwood*, 77 S.W.3d 675, 682 (Mo.App.2002). Once these findings are made, section 452.335.2 requires that the trial court, in determining the amount and duration of its maintenance award, consider the ten factors enumerated in the statute and " 'balance the reasonable needs of the spouse seeking maintenance with the other spouse's ability to pay.'" *Linton v. Linton*, 117 S.W.3d 198, 205 (Mo.App.2003) (quoting *Myers*, 47 S.W.3d at 409). When both steps have been satisfied, the statute provides that maintenance should be awarded "in such amounts and for such

---

**9.** Wife presented evidence showing that her current, average monthly expenses totaled $9,495.00. There is evidence in the record

showing that Husband earns an average annual income in excess of $475,000.00 annually.

periods of time as the court deems just."
§ 452.335.2.

 "Although a trial court's decision regarding maintenance is presumed correct, a judgment on maintenance will be disturbed on appeal where it is improper under [the standard of] *Murphy v. Carron*, 536 S.W.2d 30, 31 (Mo. banc 1976)...." *In re Marriage of Eck*, 904 S.W.2d 60, 62 (Mo.App.1995) (internal citation omitted). In the absence of a finding that the amount is patently unwarranted and wholly beyond the means of the spouse who pays, this court will not interfere with the circuit court's award of maintenance. *Petty v. Petty*, 739 S.W.2d 738, 741 (Mo.App. 1987). "Husband, who contends the circuit court erred in awarding *any* maintenance to [W]ife, bears the burden of proving the maintenance award 'shocks' this court's sense of justice." *Kirkwood*, 77 S.W.3d at 682 (quoting *In re Marriage of Pahlow*, 39 S.W.3d 87, 91 (Mo.App.2001)).

> In deciding the propriety of a maintenance award and the sufficiency of a spouse's property to provide for his or her reasonable needs, the trial court must consider marital property apportioned to a spouse, including the interest a spouse will earn from his or her share of the marital property. This 'reflects the general principle that investment income must be considered, so that maintenance is not awarded for the purposes of building an estate or accumulation of capital.' But, a spouse is not required to deplete his or her apportioned share of marital property before being entitled to maintenance. With respect to retirement and IRA accounts that have been apportioned as marital property, our Supreme Court has struck a balance between these two competing principles, and set forth the following guidelines:

> In sum, when calculating maintenance, a trial court must consider the income from retirement and IRA accounts to be apportioned as marital property. The trial court determines the amount of income—if any—imputed from these accounts based on the facts and circumstances of each case—including the cost to convert the account into cash, the age of the parties, their intent as to investment/consumption/retirement, the relative division of marital property and marital debts, and any equitable adjustment for reasonably certain taxes and penalties.

*Lee v. Lee*, 117 S.W.3d 693, 696 (Mo.App. 2003) (quoting *Hill v. Hill*, 53 S.W.3d 114, 116 (Mo. banc 2001)); *see also* § 452.335.1. "The trial court is not required to impute income attributable to retirement and IRA accounts awarded as marital property, but the court is required to 'consider' such income when calculating maintenance." [10] *Lee*, 117 S.W.3d at 697. Accordingly, a "trial court's failure 'to set forth the necessary information to determine what income from IRA and retirement accounts apportioned to the spouse seeking maintenance as marital property the trial court considered in calculating maintenance' is reversible error." *N.M.O.*, 115 S.W.3d at 857 (quoting *Muenz*, 99 S.W.3d at 9).

In the present matter, we discern from the record that in determining the income Wife would receive from the investment accounts apportioned to her, the trial court only considered the "liquid assets" awarded to Wife and failed to consider the IRA/retirement accounts she also received.

---

10. *See also Fischer v. Fischer*, 66 S.W.3d 43, 44 (Mo.App.2001); *Jung v. Jung*, 886 S.W.2d 737, 740 (Mo.App.1994); *In re Marriage of Novak*, 83 S.W.3d 597 (Mo.App.2002); *Cohen v. Cohen*, 73 S.W.3d 39 (Mo.App.2002); *N.M.O.*, 115 S.W.3d at 857; *Muenz v. Muenz*, 99 S.W.3d 4, 9 (Mo.App.2002).

In its calculations on the Form 14 Child Support Calculation Worksheet, the trial court specifically imputed income to Wife in the amount of "$3,047.00 per month earned on $812,768.00 at 4.5 [percent]...." The $812,768.00 figure was derived from combining the amounts in the four investment accounts awarded to Wife.[11] However, in addition to those accounts, Wife was awarded two IRA accounts valued at a total of $522,759.00.[12] Yet, "[t]he trial court did not explain in its judgment whether it considered income from the IRA [accounts], if at all." *Fischer*, 66 S.W.3d at 45. While "[t]he court was not required to impute income attributable to the [two] IRA accounts," the trial court was "required to 'consider' the income from these accounts when calculating maintenance." *Lee*, 117 S.W.3d at 697. "Thus, we are unable to determine the extent to which the trial court complied with *Hill*." *Id.*

Pursuant to *Hill* the trial court *must consider* whether any income may be imputed to the IRA accounts awarded to Wife as marital property, and if so, the amount of that income, if any, when calculating the amount of maintenance to award Wife. We are compelled to reverse the maintenance award and remand the matter of maintenance for further consideration by the trial court consistent with this opinion.

The judgment's award of maintenance to Wife is reversed. The matter of maintenance is remanded to the trial court for further proceedings consistent with this opinion, including the taking of further testimony and evidence if required. In all other respects the judgment of the trial court is affirmed.

PARRISH, P.J., and BATES, C.J., concur.

---

11. Wife was awarded Smith Barney account # 736–21501–17 valued at $668,495.00; Smith Barney account # 736–46699–16 valued at $111,870.00; Wood and Huston account # 60217 valued at $30,470.00; and, Wood and Huston account # 515868 valued at $1,933.00. The total value of these accounts equals $812,768.00.

12. Wife was awarded Smith Barney account # 736–67020 which was valued at $72,759.00 and $450,000.00 in the form of a Qualified Domestic Relations Order from Smith Barney IRA account # 736–6f397–19.