Sarah M. DOWELL, Appellant,

v.

Joseph J. DOWELL, Respondent.

No. WD 64640.

Missouri Court of Appeals,
Western District.

Oct. 17, 2006.

Marilyn M. Shapiro, Kansas City, MO, for appellant.

Jeffrey S. Bay, Kansas City, MO, for respondent.

Before BRECKENRIDGE, P.J., and HOWARD and HOLLIGER, JJ.

VICTOR C. HOWARD, Judge.

Sarah M. Dowell appeals the trial court's division of property, apportionment of income tax liability and failure to award her maintenance in the judgment of dissolution of marriage from Joseph J. Dowell. We affirm in part, and reverse and remand in part.

Sarah Dowell and Joseph (Jack) Dowell were married on March 11, 1950. Two children were born of the marriage, Joseph Dean ("J.D.") and Vera. The family owned a farming operation, Dowell Farms, and in 1984, started a grass seed business, J & J Seed. J & J Seed raised grass seed on its property and harvested and custom cleaned the seed, and provided these services for other growers as well. Sarah Dowell worked in the office of J & J Seed, and received a weekly salary, which was most recently $400. The parties' children, J.D. and Vera, as well as their grandson, Trent Dowell, and granddaughter's husband, Edgar R. Chrisman, Jr. ("Jay"), also worked for the business. They received salary and other financial compensation, as well as access to and use of farmland, buildings and equipment.

In March 2000, Joseph, Trent and Jay purchased 260 acres known as "Noah Farms," for the production of seed, each taking a one-third interest, with Joseph supplying the $43,000 down payment. The parties also rented additional property for soybean production. J.D., Trent and Jay also had their own farming operations, and cleaned, stored, inventoried and sold their crops through J & J seed. Vera started an associated company, Dowell Investments, at some time prior to 2000, as well as working in the office of J & J Seed.

Financial statements for Joseph and Sarah reflected a net worth, including the farming and seed operations, of $1,209,966 as of December 31, 1999; $1,598,256 as of December 31, 2000; and $1,523,607 as of October 31, 2002.[1] The Dowells' federal income tax returns reflected farming income attributable to J & J Seed and showed adjusted gross income after business expenses of $63,799 in 2000, $93,951 in 2001, which was increased to $212,286 after an amended return reflected $118,335 in additional income not previously claimed in the original return representing checks held or cashed by Joseph and Vera, and $345,549 in 2002.[2]

On August 28, 2002, Sarah filed for dissolution of marriage in DeKalb County. In her petition, Sarah asked to be awarded maintenance and an equitable portion of the marital property. In his counter-petition, Joseph contended that neither party was entitled to maintenance because adequate assets and income from the division of property existed for the parties to support themselves.[3]

About this time, J.D., Trent and Jay left J & J Seed, and started a competing seed business. Although not part of this appeal, the trial court consolidated with the divorce action, actions between Joseph, Trent, and Jay regarding settlement of farming business agreements related to the "Noah" property.

Sarah introduced a proposed settlement requesting three tracts of land, "Top of the Hill, Ramsbottom, and Noah" valued at $203,600, her automobile valued at $4,825, household goods valued at $14,000, a retirement account valued at $11,000, machinery valued at $97,465, one-half of any proceeds from litigation between Joseph and J.D. and Jay, and a cash equalization settlement in the amount of $566,399. She asked that she be held harmless for any debts, including the IRS debt.

1. The legal file submitted to this court did not contain copies of financial statements from 2001 or 2003.

2. The 2001 amended income tax return resulted in additional federal taxes due of $42,163.

3. The parties agreed to have the matter transferred to Daviess County on October 10, 2002.

Joseph's proposed settlement asked for three properties, "Ramsbottom, Top of the Hill, and the homestead with residence" valued at $288,000, his pickup valued at $18,042, equipment valued at $267,605, seed inventory of $122,440, crops in field valued at $25,000, a retirement account valued at $12,000, and the business of J & J Seed which he valued at $50,000. He accepted the debt of the businesses in the amount of $429,078, but requested that the tax obligations, including penalties and interest in the amount of $318,476, be divided equally between the parties.

On March 24, 2004, the circuit court ordered dissolution of the marriage and division of the marital assets. The trial court set aside the following property to Sarah: two parcels of real estate "Top of the Hill" and "Noah" valued at $141,600; a lake lot at $2,000; a car at $5,000; livestock at $1,500; personal property at $14,000; retirement account at $12,000; an amount recoverable from a judgment in settlement of seed operations between Joseph and other family members at $20,351, and a cemetery plot at $500. Combined with the business equipment valued at $86,585 and seed crop at $17,500, the value of the property distributed to Sarah totaled $301,036. The trial court did not order maintenance.

The trial court set aside the following property to Joseph: three parcels of real estate, including "Ramsbottom," "Eckelberry," and the marital home valued at $256,000; a truck at $18,042; personal property at $1,300; retirement account at $12,000; cash value of a life insurance policy at $280 and a cemetery plot at $500. Combined with the assets of $526,898 and debts of $429,078 of J & J Seed, the value of the property set aside to Joseph totaled $385,942. From this amount, Joseph was also ordered to pay Sarah a cash equalization award of $37,302. The property distribution amounts totaled $348,640 to Joseph and $338,338 to Sarah.

The trial court further ordered Joseph to pay $15,000 toward Sarah's legal fees. It ordered the parties to equally divide and become responsible for the income tax liability of $318,476. The court conditioned Sarah's receipt of half of the cash equalization award on her cooperation in signing the income tax forms.

 Sarah appeals the judgment of the trial court, contending that the court erred in its valuation and division of marital property, erred in ordering Sarah to assume half of the income tax liability, and erred in failing to award her maintenance. Our review is governed by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976), and thus, we affirm the trial court's decision "unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Laffey v. Laffey*, 4 S.W.3d 655, 658 (Mo.App. W.D.1999) (citing *Murphy*, 536 S.W.2d at 32). Deference is given to the trial court with regard to its superior ability to view witnesses and determine the credibility of the testimony given. *Id.* "We defer to the trial court's decision, even if the evidence could support a different conclusion." *Id.*

I. Division of Marital Property

In her first point, Sarah contends that the trial court abused its discretion in dividing the couple's property and that the resulting division was inequitable. In six sub-points, she argues this is so because the trial court did not properly value J & J Seed, did not consider the value of certain assets either squandered or secreted by Joseph during the pendency of the divorce, did not consider business income unaccounted for and other cash advances made to the couple's daughter through the business, did not properly consider statutorily-

defined requirements in the property division, gave too much weight to the credibility of Joseph's testimony as to the value and existence of property, and put inequitable stipulations on the equalization payment ordered that Joseph pay to Sarah.

The disposition of property in an action for dissolution of marriage is governed by Section 452.330, RSMo 2000, which directs that "the court shall set apart to each spouse such spouse's nonmarital property and shall divide the marital property and marital debts in such proportions as the court deems just after considering all relevant factors[.]" Because the parties to this action had no minor children, of the five factors specifically delineated in section 452.330.1, relevant to the trial court's consideration were:

"(1) The economic circumstances of each spouse at the time the division of property is to become effective, . . . ;

(2) The contribution of each spouse to the acquisition of the marital property, including the contribution of a spouse as homemaker;

(3) The value of the nonmarital property set apart to each spouse;

(4) The conduct of the parties during the marriage. . . . "

No set formula exists as to the weight accorded each of these factors, and the trial court "is vested with great flexibility in its division of marital property." *Laffey*, 4 S.W.3d at 659 (citing *Woolridge v. Woolridge*, 915 S.W.2d 372, 376 (Mo.App. W.D.1996)). "The division need not be equal but must be fair and equitable given the circumstances of the case." *Id.* (citing *Dardick v. Dardick*, 670 S.W.2d 865, 869 (Mo. banc 1984)). The trial court should consider two main principles in arriving at its decision: that "the property division should reflect the concept of marriage as a partnership or shared enterprise, [and that] the division should be used as a

means of providing for an economically dependent spouse." *Id.* (citing *Holt v. Holt*, 976 S.W.2d 25, 28 (Mo.App. W.D. 1998)).

In review of the trial court's ruling, we presume it is correct, and the party who challenges the division carries the burden of overcoming that presumption. *Id.* (citing *Knapp v. Knapp*, 874 S.W.2d 520, 524 (Mo.App. W.D.1994)). Accordingly, "[t]his court will interfere only where the division is so unduly favorable to one party that it constitutes an abuse of discretion." *Id.* The fact that one party is awarded a higher percentage of marital property is not of itself an abuse of discretion. *Id.* (citing *Gremaud v. Gremaud*, 860 S.W.2d 354, 356 (Mo.App. E.D.1993)).

### A. Valuation of the Farming Business

In her first sub-point, Sarah contends that the trial court erred in valuing the goodwill value of the business at $100,000 because no evidence of goodwill value was presented to the court. She further contends that J & J Seed was divided by the parties in October 2002, in that Joseph had complete control over the business beginning at that time, and that, therefore, the trial court should have valued the business based on Sarah's expert's opinion of the value of the business as of that time.

In valuing marital property, the trial court may receive any relevant evidence on the issue, and we give great deference to the trial court's decision. *Tarneja v. Tarneja*, 164 S.W.3d 555, 562–63 (Mo.App. S.D.2005). The trial court may "believe or disbelieve the testimony of either party concerning the valuation of property in a dissolution proceeding, and can disbelieve expert testimony." *Wofford v. Wofford*, 991 S.W.2d 194, 200 (Mo.App. W.D.1999). "When the trial court's valuation of property is within the range of

conflicting evidence of value offered at trial, the court acts within its discretion to resolve conflicts in evidence." *Taylor v. Taylor,* 25 S.W.3d 634, 644 (Mo.App. W.D. 2000). However, the trial court may not value property for which no evidence of its value was received. *Id.* The value of the property should be determined at a time reasonably proximate to the date of division of the property. *Tarneja,* 164 S.W.3d at 563. "Where the date of valuation of marital property is not reasonably proximate to the date of the distribution of the property, the trial court should hold another hearing." *Perryman v. Perryman,* 117 S.W.3d 681, 684 (Mo.App. E.D.2003) (citing *Smith v. Smith,* 985 S.W.2d 836, 841 (Mo. App. W.D.1998)).

At trial, the parties' valuation of J & J Seed was widely disparate. At the hearing on the petition, Sarah presented the testimony of Jerry Gottlieb, a certified public accountant, regarding an appraisal of Sarah and Joseph's financial condition, including appraisal of the value of J & J Seed as of October 31, 2002. Gottlieb evaluated the records for the years 2000, 2001 and 2002. In estimating Dowell Farms and J & J Seed's cash flow for those years, he added to taxable income items such as depreciation and interest expense which had been deducted as business expenses on the tax returns, as well as amounts for sales receipts not deposited, items paid with business funds not business related, and $20,000 each year for estimated tax-free fringe benefits provided to employees. From this, he estimated that the approximate cash flow of the business, which would be of primary interest to potential buyers of the business, would have been $271,286 in 2000, $437,963 in 2001, and $535,757 in 2002. Gottlieb valued the businesses as of October 31, 2002, at $1,537,919, after taking a 33% discount for lack of marketability of the business in the geographic area. Gottlieb did not value the assets of the business as of the date of trial.

■ Joseph presented the testimony of Lonnie Hough, a certified public accountant, who had prepared the Dowells' tax returns since 2000. Hough created an annual comparative statement of income from 1996 through 2003 on the Dowells' business operations.[4] When assessing the value of the business, Hough only analyzed the year 2003. When asked why she had not analyzed prior years, she stated that it was "[b]ecause a buyer in the market would be interested in what the business is doing at the present." Hough based her figures on the facts that J & J Seed had less acreage under its control, had lost three full-time employees, and lost control of one of its two seed cleaners. Hough determined that the net income of the business after depreciation was $20,802 in 2003. The income tax returns for 2003 actually prepared for the Dowells reflected adjusted gross income of $28,802. Although no prior year had an expense for legal fees, Hough's 2003 analysis contained a deduction of $35,730. When Hough "normalized" the income, she added deductions of $24,960 for "owner compensation" which had never previously been claimed, $11,758 for seed plant maintenance, and lowered amounts previously deducted of $9,129 for professional fees, $4,450 for feed, and the entire $35,730 in legal fees. Hough increased the amount of depreciation by $11,346. This resulted in a normalized net income for the business of $4,338. Hough testified that, in her opin-

---

4. The statement calculated net income after deductions for depreciation at $57,500 for 2000, $208,557 for 2001 and $341,334 for 2002. No explanation was made for the difference between these numbers, and those of the tax returns for the same years.

ion, the business did not have any value over and above its assets.

In valuing the assets of J & J Seed in the division of property, the trial court valued equipment at $357,124; inventory at $122,440; crops in the field at $42,500, accounts receivable of $7,979, Farm Credit stock of $1,000, and a "blue sky" or going concern value of $100,000, for a total value of $630,983. Describing this last determination of value of the business, the trial court said: "[I]t's easy to figure up how much the inventory is worth, how much the machinery is worth and the crops, but it's difficult to figure the blue sky." The business was also assigned its debts, including a bank operational loan of $372,162, accounts payable of $46,605, and a farm credit loan of $10,311.

Sarah argues that the trial court set an arbitrary value for the business unsupported by the evidence, and urges us to declare that the trial court abused its discretion in valuing J & J Seed, in that there was no testimony regarding a going concern value of the business, and that leads to the inference that, because the court mis-valued some assets, the court incorrectly valued the entire business. Sarah contends there was no basis for Joseph's expert's opinion that the business "had such a negative value" and that the trial court should have accepted her expert's valuations.

With regard to the going concern value of J & J Seed, Sarah's expert listed in his analysis of the Dowells' financial condition a value of $1,537,919. Joseph's expert testified that the business had no value beyond that of its assets. We note that Sarah's expert's opinion did not value the business as of the date of the trial as is necessary for the court's division of property. *Tarneja*, 164 S.W.3d at 562–63. Conversely, we also note that Joseph's expert gave little historical perspective regarding the value of the business, and that she admitted if she had been given other information regarding the operation of J & J Seed's business, that her opinion of the value might have been different.[5]

Our review of the evidence finds that the trial court's valuation of J & J Seed at $630,983 was within the range determined by Joseph's expert of no value over hard assets versus the $1,537,929 value determined by Sarah's expert. The circuit court is given deference to judge the credibility of witnesses, and although this court may have come to a different conclusion, we do not find that the trial court abused its discretion in valuing J & J Seed. To the extent that Sarah raises issues of non-accounting for assets not in existence at the date of trial, we address those in the following point.

### B. Accounting for Squandered or Secreted Marital Assets

In her second sub-point, Sarah contends that the trial court erred in failing to "take into consideration assets which were squandered by [Joseph] during the time of the filing of dissolution and the time of trial." Specifically, Sarah contends that

5. On cross-examination, Hough testified that prior to 2003, J & J Seed had prepared all their own records that were used to file the tax returns and that she admitted that she would have no way to know if J & J Seed earned income that was not reflected by deposits into bank accounts. Hough was also not aware that some of the leases of seed producing property were transferred to Dowell Investments, controlled by Vera. Hough further agreed that the value of a company could be affected by the giving away of assets or by ceasing to operate the business in an appropriate or vigorous fashion, and that her assumptions about the value of the business were based on the information given to her by Joseph, and if it was not true, that the "assumptions based upon those untruths are also untrue."

values of certain property reflected in a financial statement Joseph prepared as of October 31, 2002, were greatly reduced by the time of trial, and that Joseph did not properly account for the usage of the funds. These include the value of inventory which was reduced from $525,000 to $122,000; equipment valued at $618,000 which was reduced to $357,124; the cash surrender value of life insurance which was $77,925 and reduced to $280; and livestock which was valued at $28,000 and reduced to $1,500. Sarah further contends that the 2002 income tax return showed income of $345,549, and that Joseph did not account for the usage of those funds.

 As a general rule, the trial court may only value and divide assets which exist as of the date of trial of the dissolution. *Fitzwater v. Fitzwater*, 151 S.W.3d 135, 137 (Mo.App. W.D.2004) (citing *Conrad v. Conrad*, 76 S.W.3d 305, 314 (Mo.App. W.D.2002)). "An exception to this general principle exists where a spouse is found to have secreted or squandered marital assets in anticipation of the marriage being dissolved. In such a case the court may charge the offending spouse with the value of the secreted or squandered asset." *Id.* (citation omitted). This may be accomplished by reducing the offending spouse's share of the division of marital property or by ordering reimbursement. *Lawrence v. Lawrence*, 938 S.W.2d 333, 338 (Mo.App. W.D.1997). A spouse who produces evidence that he or she used marital assets to pay for ordinary living expenses during the pendency of the divorce is not considered to have squandered the assets. *Id.*

 The burden of raising the issue of whether marital property has been squandered or secreted is on the spouse claiming that such conduct has occurred. *Id.* "Once raised, the burden of producing evidence shifts to the alleged wrongdoer

spouse who must 'account' for the asset by presenting evidence as to its whereabouts or disposition." *Fitzwater*, 151 S.W.3d at 137 (citing *Conrad*, 76 S.W.3d at 315). However, the burden of persuasion remains on the spouse who raised the claims that property had been misappropriated, the value of which had been squandered or secreted. *Id.*

 The financial statement prepared by Joseph as of October 31, 2002, listed assets of $1,972,583, including $618,028 of machinery, $687,750 of farm real estate, $528,222 in seed inventory, and $28,300 of cattle. The parties also held life insurance policies with a cash value of $77,930. At the time of trial, the value was significantly reduced, with the value of the machinery at $357,124, farm real estate at $397,600, seed inventory at $122,440, cattle at $1,500, and the cash value of the life insurance was $280. Joseph testified on cross-examination that he had sold $200,000 worth of equipment and machinery after Sarah filed for divorce, sold $525,000 worth of seed inventory, sold $23,000 worth of cattle, and borrowed $77,000 against the cash value of the life insurance policies. The proceeds of these sales totaled $825,000.

In attempting to account for this large sum, Joseph testified that he used the money from the sale of inventory for operating expenses including "people we owed seed for," labor, insurance, fuel, "breakage, wear, and tear, overalls, anything." At one point, Joseph testified that he did not pay down any operating loans with the proceeds of the sale of some of the equipment, but later testified that proceeds from the sale of a combine and "platform" had gone to pay loans at Farmers Bank. The evidence showed, however, that the loan balance of the Farmers Bank operating loan was listed as $366,207 as of October 31, 2002, and increased to $372,162 as of the date of trial. As to the sale of the

cattle, Joseph testified that he used $10,000 of the proceeds to pay amounts ordered by the court to Sarah, but did not account for the remaining funds. As to the proceeds from the life insurance, Joseph testified that he used the money to cover overdrafts in the business checking account, and to pay insurance of $10,000 per month, but did not specify how many months of insurance he paid.[6] He later testified that he used part of the life insurance proceeds for the $43,000 down payment on the Noah farm, even though he had earlier testified that he did not use life insurance proceeds for that purpose. No accounting was made for the expenditure of the amount of adjusted gross income reflected in the parties' 2002 income tax return. The record does not reflect that Joseph supported any of these expenditures with any documentation.

The trial court did not address these items in any way in its decree, even though the sales and life insurance proceeds represented a significant sum of approximately $825,000. While the trial court is given deference in judging the credibility of witnesses, we find that the evidence of accounting for proceeds given by Joseph on the disposition of questioned assets is simply too vague to have sufficiently demonstrated that the assets were not secreted or otherwise squandered, but were used to pay marital debts or ordinary living expenses. *See Conrad v. Conrad*, 76 S.W.3d 305, 317 (Mo.App. W.D.2002). We, therefore, reverse and remand this issue for the trial court to fully develop the record as to the disposition of these assets by Joseph, and to rule on whether an adjustment to the division of property is necessary.

## C. Other Business Income Unaccounted for in Property Division

In this sub-point, Sarah contends that the trial court erred in failing to account for $86,000 that Joseph or Vera cashed from the receipt of checks paid to the business but not deposited into the business accounts, as well as Joseph's allowing Vera to use $71,000 in funds for personal expense from an account titled in Joseph and Vera's name, but which Sarah alleged to contain business funds. Sarah contends that Joseph should have been assigned these amounts in the property division as squandered assets, and that the trial court's not so doing amounted to an abuse of discretion.

From the scant evidence contained in the record before this court, it appears that the questioned $86,000 sum related to business income and transactions in 2000, and the $71,000 sum related to amounts transferred or withdrawn for Vera's benefit between the period of 1999 and October 31, 2002. Sarah cites no authority for the proposition that the disposition of assets prior to the filing of a petition for divorce fall under the exception to the rule that the court may not value and divide assets not in existence at the time of trial. This is especially so when it was Sarah who filed for divorce, and there is no evidence in the record to suggest that Joseph had knowledge of the pending action such that he intentionally squandered assets in anticipation of divorce.

The record before us does not contain specific-enough evidence of transactions occurring after Sarah's filing of divorce on August 28, 2002, for this court to determine whether any such assets may have been improperly transferred out of the

---

**6.** This was so despite the fact that the tax returns reflected that the highest amount paid for annual insurance was $43,574 in 2001 when total net revenue for the farming operations was $1,120,615.

marital estate. If such evidence exists in the full record, the trial court may consider it on remand. *Conrad,* 76 S.W.3d at 317.

### D. Trial Court Compliance with Section 452.330

■ In this sub-point, Sarah contends that the trial court did not properly consider the factors set forth in Section 452.330 when it divided the couple's property, and "its division is against the weight of the evidence and not supported by substantial credible evidence." Specifically, Sarah argues that the trial court failed to consider the financial circumstances of the parties at the time of divorce and the conduct of the parties during the marriage in its allocation of property.[7]

Section 452.330.1(1) requires the trial court to consider in the division of property "[t]he economic circumstances of each spouse at the time the division of property is to become effective[.]" One of the principle considerations for the court in the division of marital property is to provide support for an economically dependent spouse. *Laffey,* 4 S.W.3d at 659. Sarah argues the trial court failed to consider her economic circumstances in that her only assured income was $446 per month from Social Security, that she was not awarded any maintenance, and that the trial court improperly relied on Joseph's estimate that Sarah could earn $127,000 in annual income from three farm properties when J & J Seed only showed a total annual profit

from all income-producing properties of $28,000 for the year 2003.[8]

Joseph introduced into evidence a statement which he prepared indicating the potential income Sarah could generate from the farming production of three different properties, as well as fees from renting farming equipment to others. Joseph's estimate was $127,689.97. Sarah's attorney objected to the evidence, stating that it was "pure speculation" and that "if, in fact, there is any relevancy to this outside of it being Mr. Dowell's wild guess as to what Mrs. Dowell can earn, we don't have any idea at this point in time which property it is that Mr. Dowell is willing to set aside to Mrs. Dowell." The evidence was admitted over the objection.

Our review of the income-producing statement created by Joseph shows that the $127,689.97 amount included estimated income of $18,081 from the "Eckelberry" property, but this property was eventually distributed by the trial court to Joseph in the property division. Also included was $4,000 from "Easta Gamma," and $506 from "Easta Gamma Hay," but it is unclear from the record if this was a type of seed or from where it would have been produced in order to determine if that property was actually distributed to Sarah. Also included in the amount was $32,774.37 for fees generated by equipment rental and $1,200 for pasture rental fees. None of the Dowells' previous financial or tax statements listed income received from equipment or pasture rental. Sarah ultimately received the Dowells' one-third in-

---

7. Sarah also contends that the trial court failed to give adequate weight to her contributions to the acquisition of marital property pursuant to section 452.330.1(2). However, Sarah fails to describe specifically wherein and why the trial court failed to give adequate weight to Sarah's contributions, and thus, we decline to review this issue. *Thummel v. King,* 570 S.W.2d 679, 686 (Mo. banc 1978).

8. To the extent that Sarah also contends that allocation of half of the couple's income tax liability in the amount of $130,000 should also have affected the trial court's distributing more property to her, we address that contention in the next point.

terest in the "Noah" property. However, the record does not reflect whether the $71,128 Joseph claimed could be generated in income from the Noah property was the one-third amount of the total income-producing potential of the property, or whether that number was the total amount, and that one-third of that, $23,709, would have been Sarah's share. Neither does the record reflect whether the $127,689.97 in estimated income was gross income, or net income expected after expenses of production.

Beyond inferences from the Dowells' prior tax returns and financial statements of record as to gross revenues generated from farming operations, no other evidence, beyond Joseph's estimate, was presented to the trial court which delineated the average income produced from specific properties owned by the Dowells. In the comparative statement of income prepared by Joseph's expert, seed sales in 2002 were listed of $946,319, which resulted in a net income after expenses of $341,334. For the year 2003, the statement listed seed sales of $430,193, which resulted in a net income after expenses of $20,802. The record does not reflect whether the trial court considered these issues in its division of property, particularly the income-producing potential of the divided properties. Because the allocation of income-producing property is so important to the determination of whether an economically dependent spouse receives sufficient property for self-support, we remand this issue for the trial court's further consideration.

Sarah also contends in this point that the trial court failed to properly consider the requirements of section 452.330.1(4) concerning the conduct of the parties during the marriage in its allocation of marital property. She argues that Joseph committed financial misconduct during the marriage by "taking cash from the business and making advances to Vera Nelson without [her] knowledge or consent," and after separation by selling marital assets and running the farming business in a manner which reduced its productivity. She argues that any "bad conduct" attributable to her did not rise to the level of Joseph's misconduct, in that it was after separation and was related to her refusing to sign additional operating loans for the business and interfering with customers trying to do business in the office.

Even where misconduct may be found, "not all misconduct requires a disproportionate division of marital property." *Ballard v. Ballard*, 77 S.W.3d 112, 117 (Mo. App. W.D.2002). "The rationale for considering the misconduct of the spouses in dividing marital property is that 'if one spouse is compelled to contribute more to the partnership endeavor due to the other's misconduct, he or she is entitled to have the errant spouse's misconduct taken into consideration ... in dividing marital property.'" *Id.* (quoting *In re Marriage of Ballay*, 924 S.W.2d 572, 578 (Mo.App. S.D.1996) (citation omitted)). " '[I]t is only when misconduct of one spouse changes the balance so that the other must assume a greater share of the partnership load that it is appropriate that such misconduct affect the distribution of property.'" *Id.* (quoting *Nelson v. Nelson*, 25 S.W.3d 511, 519 (Mo.App. W.D.2000)).

Sarah has not demonstrated how any misconduct potentially attributable to Joseph caused her to assume a greater share of the partnership load so as to entitle her to a greater share of marital property. Therefore, we cannot say that the trial court abused its discretion in not awarding her a larger share of marital property.

### E. Weight Given to the Credibility of Joseph's Testimony

In this sub-point, Sarah contends that the trial court ignored inconsistencies in

Joseph's testimony regarding the use of proceeds from the cash value of the life insurance policies, as well as his testimony regarding the use of proceeds from the sale of assets to pay insurance premiums in excess of those reflected as business expenses in prior tax returns, and thus, his entire testimony was given too much credibility. Sarah fails, however, to describe precisely how the trial court's determination of Joseph's credibility affected the disposition of property and what action the trial court should have taken.

The trial court is in the best position to judge the credibility of witnesses and is free to believe or disbelieve all, part or none of the testimony of any witness. *Capehart v. Capehart*, 110 S.W.3d 920, 923 (Mo.App. S.D.2003) (quotation marks and internal citation omitted). Ultimately, however, our review is affected by the fact that Sarah's "point and argument are devoid of any allegation setting forth how the alleged errors prejudiced her case." *Stelts v. Stelts*, 126 S.W.3d 499, 504 (Mo.App. S.D.2004). We decline, as we must, to speculate on this issue, as to " 'determine or clarify the nature of the asserted claims, the court may interpret the claims differently than the opponent or differently than was intended by the party asserting the claim.' " *In re Marriage of Gerhard*, 34 S.W.3d 305, 307–08 (Mo.App. S.D.2001) (quoting *Thummel v. King*, 570 S.W.2d 679, 686 (Mo. banc 1978)). We, therefore, decline to review this point.

### F. Trial Court Error in Stipulations for the Equalization Payment

Sarah contends in this sub-point that the trial court placed inequitable stipulations on her receipt of a cash equalization payment from Joseph in the amount of $37,302.44 by conditioning the payment on Sarah's full cooperation "in the preparation, execution and filing of the parties'

joint federal and state tax returns for the years 2001, 2002 and 2003." Sarah inaccurately contends in this point that payment was also conditioned on her payment of a one-half share of the tax liability amounting to $130,000, an amount which she contends she cannot afford, and that the division of property was, therefore, inequitable.

Sarah does not support her point with citation to Missouri authority, and our research reveals none, that a trial court abuses its discretion by placing a condition upon the receipt of the cash equalization payment. We, therefore, decline to review this point. To the extent that Sarah contests the trial court's division of the income tax liability, we address that issue in the second point.

Finally, although Sarah's brief contains a sub-point "G," it is merely a summary point contending that for all the above-listed reasons, the trial court's division of property was so "arbitrary and unreasonable as to shock one's sense of justice and indicate a lack of careful consideration." As noted above, we reverse and remand the division of property determination for the trial court to consider and address whether Joseph squandered or secreted marital assets and the value thereof, and to determine the income-producing value of marital property, and the fair apportionment thereof.

### II. Division of Income Tax Liability

In her second point, Sarah contends that the trial court erred in ordering her to assume half of the parties' income tax liabilities for the years 2001, 2002, and 2003, because the trial court failed to consider that Joseph was responsible for the increase in the taxes owed in 2001 through his failing to claim $118,000 in income, because Joseph claimed virtually all of the $359,000 net income for his own use in

2002, and because the court failed to take Sarah's financial situation into account when dividing the debt. Joseph responds that it was uncontroverted that the income tax liability was a marital debt and that we should presume that the trial court took into account all the evidence and believed that which is consistent with its judgment.

Although prior to 1998 trial courts were not obligated to distribute marital debts because they were not considered marital property, in 1998, the legislature amended section 452.330.1, RSMo (Cum.Supp.1999), to require the court to " 'divide the marital property and marital debts in such proportions as the court deems just after considering all relevant factors....' " *Cross v. Cross,* 30 S.W.3d 233, 236 (Mo.App. E.D.2000) (quoting RSMo section 452.330.1). "The fact that one spouse did not control or actively participate in the decision to incur a debt does not preclude its allocation to that spouse where it is determined to be marital debt." *Travis v. Travis,* 163 S.W.3d 43, 49 (Mo. App. W.D.2005) (citations omitted). "In dividing marital debt, the trial court is vested with broad discretion in determining how and in what manner the debts should be divided, and this court will not disturb its division absent a clear showing of an abuse of discretion." *Cross,* 30 S.W.3d at 236. "An abuse of discretion occurs when a trial court's ruling is 'clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock one's sense of justice and indicate a lack of careful consideration.' " *Id.* (quoting *Wright v. Wright,* 1 S.W.3d 52, 60 (Mo.App. W.D.1999)).

Sarah argues that she should not be held accountable for half of the 2001 tax liability because of the "conscious acts" of Joseph and Vera in failing to disclose $118,000 in income received by the farming business, which resulted in increased tax due. She also argues that she should not be obligated to pay half of the 2002 income tax liability on the $349,000 income because Joseph controlled the entirety of the business and the only financial benefit she received was $400 per week in salary from working in the office of the business. Finally, she argues that the trial court only awarded her $37,000 in liquid assets, which was conditioned upon her cooperation in signing the contested tax returns, and that to pay one-half share of the $259,000[9] would require her to liquidate the income-producing property originally allocated to her. Joseph responds that it is presumed that the trial court took all evidence and testimony into consideration and its determination was not an abuse of discretion.

Because the trial court is required by section 452.330.1 to "divide the marital property and marital debts in such proportions as the court deems just after considering all relevant factors[,]" our remand for the trial court to consider issues related to the property division will necessarily require a reconsideration of the just distribution of the marital debt. We, therefore, reverse and remand this issue to the trial court for its further consideration.

## III. Failure to Award Maintenance

In her third point, Sarah contends that the trial court erred in failing to award her maintenance because the court incorrectly held that she did not make a request for maintenance, that the court did not take her reasonable needs into consideration and that the court did not award her sufficient property to support herself and pay

---

**9.** The total amount of the income tax liability was actually higher when penalties and accumulated interest are considered.

the income tax debts assigned to her. Joseph responds that Sarah waived her claim of maintenance and that the trial court awarded Sarah sufficient income-producing property to meet her reasonable needs.

The purpose of an award of maintenance is to bridge the gap between the reasonable needs of a spouse and that spouse's income. *Tarneja,* 164 S.W.3d at 564. Section 452.335 governs the determination of whether a maintenance award is appropriate, and involves a two-step process. *Id.* In the first step, the trial court is required to analyze the evidence to find whether: "(1) the party seeking maintenance lacks sufficient property, including marital property apportioned to that spouse, to provide for his or her reasonable needs; and (2) the party seeking maintenance is unable to support herself through appropriate employment." *Id.* (citing Section 452.335.1). If so determined, the trial court moves to the second step, which in "section 452.335.2 requires that the trial court, in determining the amount and duration of its maintenance award, consider the ten factors enumerated in the statute [10] and balance the reasonable needs of the spouse seeking maintenance with the other spouse's ability to pay." *Id.* (citations and internal quotation marks omitted). The award of mainte-

nance is to be "in such amounts and for such periods of time as the court deems just, and after considering all relevant factors." Section 452.335.2. The trial court is given broad discretion in its decision concerning an award of maintenance. *Tarneja,* 164 S.W.3d at 565.

A spouse may "in open court voluntarily and understandingly" waive a claim to maintenance. *Farris v. Farris,* 75 S.W.3d 345, 350 (Mo.App. W.D.2002). The trial court may accept such a waiver, as to do so promotes judicial efficiency. *See Samuels v. Samuels,* 713 S.W.2d 865, 871 (Mo.App. W.D.1986). However, "[w]aiver is the intentional relinquishment of a known right and if implied from conduct, the conduct must clearly and unequivocally show a purpose to relinquish the right." *Shapiro v. Shapiro,* 701 S.W.2d 205, 206 (Mo.App. E.D.1985). "[T]he determination of whether a waiver is knowing and intelligent is based on the totality of the circumstances." *Farris,* 75 S.W.3d at 348 (citing *State v. Pope,* 50 S.W.3d 916, 920 (Mo.App. W.D.2001)).

The effective waiver of a right is not accomplished where the premise upon which the relinquishment is based, is based upon a mistake. *Shapiro,* 701

---

**10.** The factors enumerated in section 452.335.2 include:

 (1) The financial resources of the party seeking maintenance, including marital property apportioned to him, and his ability to meet his needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party as custodian;
 (2) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment;
 (3) The comparative earning capacity of each spouse;
 (4) The standard of living established during the marriage;

 (5) The obligations and assets, including the marital property apportioned to him and the separate property of each party;
 (6) The duration of the marriage;
 (7) The age, and the physical and emotional condition of the spouse seeking maintenance;
 (8) The ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance;
 (9) The conduct of the parties during the marriage; and
 (10) Any other relevant factors.

S.W.2d at 206. Similarly, where an agreement to the waiver of maintenance is premised upon the court granting a party's condition, and that condition is not granted, no waiver is accomplished. *Samuels,* 713 S.W.2d at 871 (where wife offered to waive maintenance in exchange for court's allowing wife to move children out-of-state to place of new employment, but where court did not grant move, no waiver was effective).

In her petition for dissolution of marriage, Sarah asked for maintenance. In her request for the division of marital property, she asked for three farm properties, farming equipment valued at $97,465 and a cash equalization payment of $566,399. This proposal was clearly based in reliance upon her expert's opinion that the value of J & J Seed was $1,537,919. At trial, Sarah testified that her monthly expenses were $2,553, and that she was asking for maintenance in the amount of $2,107 to make up the difference between her expenses and monthly Social Security payments she received in the amount of $466.

■■■ On cross-examination, Sarah said that she was asking for maintenance, but admitted that in a prior deposition, she said that if she got half of the value of the marital property, that she was not going to make a claim for maintenance or alimony. The transcript of that deposition was not provided in the record on appeal to this court. At trial, Sarah clarified her reason for asking for some maintenance or alimony because: "I have nothing to live on because he hasn't given me—he won't give me anything after today's time is over with, unless I ask for something." She was apparently referring to the $400 weekly salary she continued to receive from J & J Seed during the pendency of the action. On further cross-examination, the following exchange took place:

Q: And is it your testimony here today that you don't believe you can support yourself without maintenance or alimony even if you're given some of this property and you're given the Noah seed cleaner?

A: I believe I asked for money until the Honorable Judge McElwain rules on this for my support. I didn't ask for alimony afterwards.

Q: And as soon as the judgment is entered and the division is made, whatever that division is, you don't want or need maintenance or alimony?

A: After the land is transferred, the warranty deeds are transferred, then I—and the Honorable Judge McElwain rules on it, then I could probably go out and get a loan and—to support myself until—it will be a year from now before I get any seed off from these places because Jack [Joseph] has taken it. So there's no seed to be had until you clean it—you harvest it in the fall, and you clean it and then you sell it. So it will be a year before I'd have any income off of the places.

Despite this, the trial court in its decree determined: "[Sarah Dowell] has waived maintenance and due to the amount of property set aside to [her] herein, no maintenance is ordered by this Court and this Order is non-modifiable. [Sarah Dowell] did not request maintenance, and none is ordered."

We find that the trial court's determination was in error. We simply do not see that the testimony in cross-examination provided the unequivocal intent to relinquish a right to an award of maintenance. Clearly, in the hearing, Sarah asked for an award of maintenance. Furthermore, it was clear that any offer to waive maintenance in the future, after the property division, was premised on Sarah's belief, mistaken or otherwise, that J & J Seed

was worth more than $1.5 million and that she would be receiving a cash equalization payment in excess of $500,000.

Therefore, we reverse and remand this issue for the trial court's reconsideration of the propriety of an award of maintenance based upon the factors set forth in section 452.335. This determination will obviously be affected by the court's reconsideration of whether any marital property was squandered and its amount, if any, that should be attributable to one of the parties, the income-producing potential of marital property, and the allocation of debt. Necessarily, because "the date of valuation of marital property is not reasonably proximate to the date of the distribution of the property," the trial court will need to consider the current value of property and the economic status of each spouse. *Perryman v. Perryman,* 117 S.W.3d 681, 684 (Mo.App. E.D.2003).

Affirmed in part, and reversed and remanded in part.

BRECKENRIDGE, P.J., and HOLLIGER, J., concur.