**Edward ARNDT, Appellant,**

v.

**Paige ARNDT, Respondent.**

No. ED 104531

Missouri Court of Appeals,
Eastern District,
**DIVISION FOUR.**

FILED: May 23, 2017

Alan E. Freed, 165 N. Meramec Ave., Suite 110, St. Louis, MO 63105, for appellant.

Michael L. Schechter, Kristen J. Dunnett, 8000 Maryland Ave., Suite 950, Clayton, MO 63105, for respondent.

KURT S. ODENWALD, Judge

## Introduction

Edward Arndt ("Ed") appeals from the motion court's judgment modifying his maintenance obligation to his ex-wife, Paige Arndt ("Paige").[1] The motion court found a substantial change in circumstances based upon Paige's employment and reduced Ed's monthly maintenance obligation from $4,444 per month to $2,489. On appeal, Ed claims that the motion court should have terminated (or further reduced) his maintenance obligation because the motion court improperly computed Paige's income and reasonable expenses. Ed also contends that the motion court abused its discretion by awarding Paige $10,000 in attorney's fees. Finding certain errors relating to Paige's expenses in the motion court's judgment, we affirm in part, reverse in part, and remand for further proceedings.

---

1. We intend no disrespect in using Edward's shortened name. Both parties used "Ed" and "Paige" in their briefs, and we follow their lead.

Factual and Procedural History [2]

In June 2010, Ed and Paige Arndt dissolved their marriage. The divorce decree incorporated the parties' separation agreement and stipulated parenting plan. Under the separation agreement, Ed was required to pay Paige $4,444 per month in modifiable maintenance.

During the marriage, Paige was a stay-at-home mother while Ed supported the household financially. After the dissolution, Paige attended the Goldfarb School of Nursing. Upon completion of her nursing studies, Paige passed her board examination and Children's Hospital hired her as a registered nurse in the Neonatal Intensive Care Unit ("NICU").

Ed sought to modify his maintenance obligation by alleging that substantial and continuing changes had occurred, making maintenance unreasonable. For changed circumstances, Ed asserted that Paige was now fully employed, that she could support herself financially, and that the children were emancipated and no longer required Paige's financial support. Thus, Ed requested that the motion court terminate or significantly reduce his maintenance obligation.

The parties submitted sworn statements of income and expenses before trial. The motion court heard evidence on three different hearing dates from August through November, 2015.

By the third day of trial, in November 2015, Paige testified that she had been hired as an operating-room nurse at another BJC hospital, Missouri Baptist. Paige had not yet started at Missouri Baptist. Paige accepted the new position because she did not like working the rotating night shifts at Children's Hospital. The hours at her new position were primarily during the days on Monday through Friday. Paige testified that she would receive the same base hourly rate as her prior position ($21.6275), but she did not know the number of shift differentials [3] she would receive nor the amount of additional pay for those shift-differential hours.

On February 29, 2016, the motion court issued a written judgment granting Ed's motion in part. The judgment reduced Ed's monthly maintenance payment from $4,444 to $2,489 per month. In modifying maintenance, the motion court found that Paige's new job was a change in circumstances so substantial and continuing as to make the terms of the original maintenance award unreasonable. The motion court declined to terminate maintenance altogether because it found that Paige was still unable to meet her reasonable expenses.

The motion court determined Ed's maintenance obligation by calculating Paige's monthly net income and her reasonable monthly expenses. In determining Paige's monthly net income from her new nursing position at Missouri Baptist, the motion court noted that Paige's base hourly rate was $21.6275. Because Paige testified that she would work mostly weekdays, for 40 hours per week, the motion court calculated Paige's monthly gross income as $3,749 (the motion court rounded up to $3,750).[4] The motion court did not include any shift

---

**2.** This section provides a broad overview of the case. Additional facts will be restated in the discussion section as needed.

**3.** Shift differentials are higher hourly rates for hours worked on nights, weekends, holidays, and other non-traditional business hours.

**4.** The motion court's calculation was Paige's hourly rate ($21.6275) multiplied by 40 hours per week, which is $865.10 per week. On a monthly basis, this number is $3,748.77 ($865.10 multiplied by 52 weeks per year then divided by 12 months).

differentials from Paige's new position, recognizing that Paige "testified she would receive differential pay as she had in [her old position] but would not be working nights or weekends on a regular basis."

The motion court then converted Paige's monthly gross income to net income. The motion court relied on Paige's testimony that, in her prior position, she had netted about 66% of her gross pay after payroll deductions. The motion court applied that percentage to her new employment. Thus, on a gross monthly salary of $3,749 in her new position, the motion court concluded that Paige's monthly net income would be $2,474 (66% of her gross salary).

Ed aggressively challenged Paige's reasonable monthly expenses at trial. Using discovery of Paige's bank accounts and credit cards, Ed compiled a pedantic litany of Paige's actual expenses from 2010 to 2014. At trial, Ed submitted a series of exhibits purporting to show that many of Paige's claimed expenses were either unreasonable, unjustified by her actual expenses, or commingled with expenditures for the children. Conversely, Paige testified and was cross-examined extensively on her claimed expenses, which she sub-

mitted to the motion court in a sworn statement of income and expenses. Paige insisted that her claimed expenses were reasonable. After hearing the evidence, the motion court made a factual finding on each of the expenses disputed by Ed, finding that Paige had $4,398,83 in reasonable monthly expenses, almost $2,000 less than Paige had claimed in her First Amended Statement of Income and Expenses.[5]

The motion court also determined that the "interests of justice" suggested that Ed pay Paige's estimated income taxes on the maintenance. The motion court concluded that Paige's total annual tax on the maintenance payments was $6,768, or $564 per month. The motion court relied on Paige's testimony that she paid $564.83 per month in federal and state taxes on maintenance in 2014, and this amount was also included on Paige's statement of income and expenses.

In awarding maintenance, the motion court found a shortfall between Paige's net income and her reasonable expenses. The motion court then added the taxes on Paige's maintenance award as an allowable expense as follows:

| | |
|---|---|
| Net Income | $2,474 |
| Reasonable Expenses | -$4,399 |
| Actual Monthly Shortfall | -$1,925 |
| Taxes on Maintenance | -$564 |
| Maintenance Need | -$2,489 |

The motion court awarded Paige $2,489 per month in modified maintenance, which reduced Ed's original maintenance obligation by $1,955 per month. The motion court made the modification retroactive three months to December 1, 2015. The motion court further ordered Ed to pay $10,000 toward the attorney's fees incurred by Paige in defending the motion to modify. This appeal follows.

### Points on Appeal

Ed raises five points on appeal. Points One and Two argue that the motion court's

---

**5.** The motion court listed and conscientiously addressed each individual expense challenged by Ed in its judgment. We will address the disputed expenses in our discussion section.

judgment was against the weight of the evidence. Specifically, Point One contends that the modified maintenance award was improperly inflated because Paige's reasonable monthly expenses were substantially less than the motion court found. Point Two avers that the motion court underestimated Paige's monthly income by not including the shift differentials that Paige would receive in her new job. Points Three and Four claim that the motion court erred in calculating Paige's tax expenses. Ed asserts that the motion court improperly imputed a 34% tax rate on Paige's gross income when calculating her net income, and used an improper tax rate to determine Paige's tax liability on the maintenance payments. Ed posits that these calculations incorrectly applied federal and state tax law (Point Three) and were unsupported by substantial evidence (Point Four). Finally, Point Five argues that the motion court abused its discretion in awarding Paige $10,000 toward the attorney's fees she incurred during the modification proceedings.

### Discussion

Ed's first four points all complain that the motion court erred in modifying his maintenance obligation. Thus, we will address those points together in the first section. In the second section, we will address Ed's Point Five, which assigns error to the award of attorney's fees.

## I. Maintenance Modification

This section addresses Ed's first four points on appeal. First, we outline our standard of review in assessing the motion court's judgment, and then we provide the general rules on awarding and modifying maintenance. We then consider Ed's first two points in turn, both of which argue that aspects of the motion court's findings were against the weight of the evidence.

Next, because Points Three and Four advance nearly the same arguments relating to the motion court's alleged miscalculation of Paige's tax obligations, we address those points together. Finally, we consider Paige's overarching argument that we should overlook any motion-court errors and, instead, affirm the judgment as reaching the correct result, even if for the wrong reason.

### A. Standard of Review

■ In reviewing a court-tried case, such as a modification proceeding, our standard of review is set forth by Murphy v. Carron, 536 S.W.2d 30, 32 (Mo. banc 1976). We will affirm unless the motion court's judgment erroneously declares or applies the law, is unsupported by competent and substantial evidence, or is against the weight of the evidence. Id.; Almuttar v. Almuttar, 479 S.W.3d 135, 138 (Mo. App. W.D. 2016).

■ Ed argues that the motion court's judgment was against the weight of the evidence (Points One and Two), was an incorrect application of the law (Point Three), and was unsupported by substantial evidence (Point Four). We review the motion court's application of law to facts de novo. Rhea v. Sapp, 463 S.W.3d 370, 375 (Mo. App. W.D. 2015).

■ For review of factual issues, more deference is accorded to the motion court's judgment. See Hughes v. Hughes, 505 S.W.3d 458, 467 (Mo. App. E.D. 2016). In deciding whether the motion court's judgment was against the weight of the evidence, we defer to the motion court's findings of fact on contested factual issues, and we defer to the motion court's credibility determinations. Id. A judgment is considered against the weight of the evidence only if the motion court "could not have reasonably found, from the evidence at trial, the existence of a fact that is neces-

sary to sustain the judgment." Id. Further, in reviewing for substantial evidence, we view the evidence in the light most favorable to the judgment, disregarding all contrary evidence and deferring to the motion court's credibility determinations. Id. Substantial evidence is evidence that, if believed, has some probative force on each fact that is necessary to sustain the judgment. Id. We overturn the motion court's judgment on these two fact-based standards only if we firmly believe the judgment is wrong. Id.

 Regarding modification of maintenance specifically, we afford the motion court considerable discretion, and the appellant must prove an abuse of that discretion. Id. "The [motion] court abuses its discretion when its order is against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration; if reasonable persons can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion." Id.

B. General Rules Governing Maintenance Modification

 Section 452.370.1 (Supp. 2014)[6] authorizes a motion court to modify maintenance "only upon a showing of changed circumstances so substantial and continuing as to make the terms [of the original dissolution decree] unreasonable." This statutory standard is designed to be strict so it discourages recurrent and insubstantial motions to modify. Barden v. Barden, 463 S.W.3d 799, 804 (Mo. App. E.D. 2015). In deciding this threshold question of whether a substantial change has occurred, the motion court considers all financial resources of both parties. Section 452.370.1. The party seeking modification bears the burden of establishing with "detailed evidence" that this substantial and continuing change occurred and that the terms of the original decree have become unreasonable. Greenberg v. Greenberg, 454 S.W.3d 390, 394 (Mo. App. E.D. 2015).

 Here, the motion court found that a substantial change in circumstances occurred because, since the parties' divorce, Paige obtained both her nursing diploma and full-time employment as a nurse. Neither party questions the motion court's finding on this threshold issue. On appeal, Husband asserts that the motion court should have further reduced or terminated maintenance given Paige's income and reasonable needs. In modifying the amount of maintenance, the motion court *may* (but is not required to) consider the factors in Section 452.335[7] that a trial court *must*

---

**6.** All statutory references are to RSMo (2000), unless otherwise noted.

**7.** The Section 452.335 factors are:

(1) The financial resources of the party seeking maintenance, including marital property apportioned to him, and his ability to meet his needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party as custodian;

(2) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment;

(3) The comparative earning capacity of each spouse;

(4) The standard of living established during the marriage;

(5) The obligations and assets, including the marital property apportioned to him and the separate property of each party;

(6) The duration of the marriage;

(7) The age, and the physical and emotional condition of the spouse seeking maintenance;

(8) The ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance;

consider in fashioning maintenance at dissolution. Brooks v. Brooks, 957 S.W.2d 783, 786 (Mo. App. W.D. 1997).

■■■■ Maintenance is for the reasonable needs of the spouse receiving it. McKown v. McKown, 280 S.W.3d 169, 175 (Mo. App. W.D. 2009). Maintenance, however, is not awarded to the receiving spouse for the purpose of building an estate or accumulating capital. Stauffer v. Stauffer, 267 S.W.3d 805, 808 (Mo. App. W.D. 2008). In other words, a maintenance award bridges the gap between the reasonable needs of a spouse and that spouse's income. Dowell v. Dowell, 203 S.W.3d 271, 285 (Mo. App. W.D. 2006). The trial court—or, in a modification proceeding, the motion court—must award an amount that it deems just after considering all relevant factors. Id.; see Section 452.335.2 (standards for determining an initial maintenance decree). Once the motion court finds a substantial change resulting in an original maintenance amount that is unreasonable, the motion court should fashion a maintenance award (or terminate maintenance) in a way that is reasonable. See Section 452.370.1 (the plain language of the maintenance-modification statute). Trial and motion courts have broad discretion to award maintenance in a reasonable and just way. See Almuttar, 479 S.W.3d at 138.

In accord with the broad rules of awarding and modifying maintenance, we address Ed's first four points on appeal.

## C. Point One—Paige's Reasonable Expenses

In Point One, Ed asserts that the motion court's maintenance award was against the weight of the evidence because the motion court substantially overstated Paige's reasonable expenses. The record shows that the motion court relied largely on Paige's sworn statement of income and expenses, as well as her trial testimony about those expenses, to determine her reasonable expenses.

■■■■ To prove expenses, statements of income and expenses are routinely admitted and relied upon without any further testimony or documentary support for each individual item. Brooks v. Brooks, 957 S.W.2d 783, 788 (Mo. App. W.D. 1997) (citing M.A.Z. v. F.J.Z., 943 S.W.2d 781, 790 (Mo. App. E.D. 1997)). The weight accorded to these statements of income and expenses is sufficient to sustain a judgment unless the expense amounts are disputed, the party seeking maintenance concedes a lack of knowledge about the actual amounts of the claimed expenses, *and* the party testifies inconsistently about the amounts claimed. Brooks, 957 S.W.2d at 788 (crafting this test from the holding in M.A.Z., 943 S.W.2d at 790). This exception, first articulated in M.A.Z., was a case-specific holding that should not be applied to a case that does not share the "unique" facts of M.A.Z. Herschend v. Herschend, 486 S.W.3d 346, 353 (Mo. App. S.D. 2015).

■■■■ The motion court was ultimately required to decide what expenses, in light of all relevant factors, were reasonable and appropriate. Hammer v. Hammer, 139 S.W.3d 239, 245 (Mo. App. W.D. 2004). Reasonable needs are seldom a matter of mathematical precision, and expense submissions need not be based on strict necessity. Id. The purpose of maintenance is to achieve a just result in light of all relevant considerations. Id. We now address each of the expenses challenged by Ed.

(9) The conduct of the parties during the marriage; and

(10) Any other relevant factors.

### 1. Life Insurance

██ Paige carries life insurance for the benefit of their children.[8] Paige testified that the proceeds of the policy would be enough for her "children to take care of whatever needed to be taken care of when I die and not have worries about funeral costs or estate costs or whatever costs are involved with death." Ed argues that a life-insurance policy on Paige's life cannot be counted among Paige's present, reasonable needs.[9] We are aware of no Missouri authority directly addressing whether a spouse receiving maintenance may include, as a reasonable need, the monthly premiums for a life-insurance policy on his or her life for the benefit of the parties' children.

In support of his contention, Ed relies on In re Marriage of Boston, 104 S.W.3d 825, 832 (Mo. App. S.D. 2003). Boston held that a dissolution court was without authority to require the ex-husband (the paying spouse) to carry a life-insurance policy on his life that named the ex-wife or the minor child as beneficiaries. Id. Because the benefits of the life-insurance policy were not payable prior to the ex-husband's death, a decree requiring the ex-husband to maintain a life-insurance policy on his life constituted posthumous child support. Id. A motion court lacks authority to require posthumous child support.[10] Id. Notably, the Boston court did not consider whether the requirement to name the ex-wife as a beneficiary might have been proper as express posthumous maintenance. Cf. McAvinew v. McAvinew, 733

S.W.2d 816, 819 (Mo. App. W.D. 1987) (distinguishing the same line of cases regarding child support on which Boston relied, and holding that an order requiring maintenance in the form of life insurance expressly provides posthumous maintenance, which is allowed under Section 452.370); Section 452.370.3 ("Unless otherwise agreed in writing or expressly provided in the judgment, the obligation to pay future statutory maintenance is terminated upon the death of either party or the remarriage of the party receiving maintenance.").

In any event, Boston does not control this case. The dissolution court in Boston required the ex-husband to maintain a life-insurance policy on *his* life; here, on the other hand, the motion court required Ed to pay the premiums of a life-insurance policy on *Paige's* life. The core rationale of Boston was that the life-insurance policy could not, by definition, pay out until after the ex-husband died—thus the trial court's order forced the ex-husband to provide posthumous support. Here, Paige's life-insurance policy would pay out at Paige's death, which could happen while Ed is still alive. Further, if Ed died before Paige, he would be relieved of his duty to pay premiums. So Paige would need to continue paying the premiums, which would mean that Paige would be supporting the children. Accordingly, we do not see Ed's obligation as requiring posthumous child support.

However, the life-insurance expense presents another problem: the proceeds

---

8. The monthly premium is $9.00.

9. Given Ed's salary (approximately $360,000 a year, including his bonus) and stipulated ability to pay, it seems extremely litigious to be fighting an award of $9 per month that would ultimately benefit his children. Had this miscalculation been the sole assignment of error, the de minimis amount at issue would not suggest a lack of careful consider-

ation by the motion court and would not justify remand.

10. We have recognized, however, that the parties may provide for posthumous child support in a settlement agreement. Wheeler v. McDonnell Douglas Corp., 999 S.W.2d 279, 287 (Mo. App. E.D. 1999).

from the life-insurance policy do not benefit Paige. Our caselaw is clear that the requirement to pay premiums on a life-insurance policy is seen as a support obligation to the *beneficiaries* of the policy. See Boston, 104 S.W.3d at 832 (ex-wife and child were beneficiaries of the policy, and ex-husband's requirement to pay premiums was seen as a support obligation to them); McAvinew, 733 S.W.2d at 819 (ex-wife was the beneficiary of the policy, and ex-husband's obligation to pay the premium was seen as maintenance); Niederkorn v. Niederkorn, 616 S.W.2d 529, 538 (Mo. App. E.D. 1981) (benefits of the life-insurance policy, not payable until after the husband's death, amount to posthumous child support). Paige testified that the purpose and benefit of the policy was to allow the children to take care of her post-death expenses and not to worry about "funeral costs or estate costs or whatever costs are involved with death." While we understand that Paige considers life insurance to be a reasonable expense, it is undisputed that her life-insurance policy, according to her testimony, benefits the parties' children.

 The law is clear that maintenance is limited to the needs of the recipient—here, Paige. Courtney v. Courtney, 458 S.W.3d 462, 477 (Mo. App. E.D. 2015). Missouri law holds that "awards of spousal maintenance and child support are two distinctly separate concepts, and that maintenance does not include child support." Id. (quoting Schubert v. Schubert, 366 S.W.3d 55, 64 (Mo. App. E.D. 2012)). The needs of the parties' children are not to be included in any maintenance award. Id.

Here, the motion court misapplied the law and erred in allowing Paige's life-insurance premiums as her reasonable need. While the policy insured Paige's life, the death benefit would not inure to her benefit. As Paige testified, the children will receive the benefit of the policy. Moral obligations aside, the children may do as they please as beneficiaries of the policy. The record is void of any limitation placed on the children upon receipt of any death benefits following Paige's death. The record does not suggest that Paige discussed her thoughts with the children or that the children accepted any limitation on their use of any death benefits. Given the lack of evidence supporting an obligation to use the insurance proceeds to address expenses related to Paige or her death, we are compelled by law to disallow this expense. In effect, by allowing this expense, the motion court has required Ed to pay child support through the guise of maintenance. Despite the reasonableness of the Paige's intention, the life-insurance expense for this policy is not related to Paige's reasonable needs. See Courtney, 458 S.W.3d at 477. The motion court misapplied the law by finding the life-insurance premium as a reasonable need.[11]

## 2. Charitable Contributions

 Ed argues that the motion court erred in allowing Paige $125 per month as a reasonable expense for charitable giving. The evidence at trial indicated that the parties gave $1,600 per month to charity during the marriage; that amount was split between "weekly tithing" to their church

11. Had Paige's life-insurance policy benefitted her estate for the purpose of covering her after-death expenses, the law would have allowed the motion court to exercise its discretion in allowing the expense under our rationale. Using a life-insurance policy in this manner is akin to medical insurance—making reasonable payments now to cover reasonable future expenses incurred by and on behalf of Paige. In that case, the motion court properly could apply the law and deem the life-insurance premiums to be a present expense tailored to cover Paige's after-death expenses, and thereby be considered maintenance.

and an annual gift to their children's high school. Paige also testified, "And sometimes if somebody was in need or somebody was going on a missionary trip we would donate as well." Ed accurately notes that Paige's current charitable contributions (at the time of the modification proceedings) were not to the parties' church and the high school, Paige testified that she now donates money to an orphan in Africa and to missionary groups based in the Philippines, Orlando, and St. Louis. These targets of Paige's generosity, Ed contends, represented a different set of choices from those the family selected during the marriage, choices to which he should not be bound. We find Ed's argument unavailing.

■ The general rule is well established: modest charitable contributions may be included when figuring reasonable expenses of the party seeking maintenance, but only if substantial evidence exists that those contributions were made throughout the course of the marriage. Batka v. Batka, 171 S.W.3d 757, 762 (Mo. App. E.D. 2005). We have approved charitable expenses "where they fit within the parties' overall pattern of spending prior to the dissolution." Hosack v. Hosack, 973 S.W.2d 863, 871 n.5 (Mo. App. W.D. 1998).

Notably, Ed has cited no authority limiting the spouse's charitable contributions after the marriage to the *exact* charitable entity that the parties supported during the marriage. We have found no authority to support the limitation asserted by Ed.

Paige initially sought $550 per month in charitable contributions to be included in her allowable expenses. Upon careful and thorough review, the motion court substantially reduced Paige's monthly charitable expense to $125. While it is unclear why the motion court chose $125, our record indicates that the motion court considered Paige's claimed expense and Ed's argument, and exercised its discretion to substantially reduce her claimed amount.

We hold that substantial evidence exists of similar charitable contributions made throughout the marriage, which justifies the motion court's award of a modest charitable expense in its maintenance calculation. Paige testified that the couple sometimes donated to people "going on a missionary trip" during the marriage. Paige stated that she now donates to several missionary groups, and the word "missionary" naturally contemplates "one sent to propagate the faith, doctrine, and principles of a religion or a religious group among nonbelievers." See Webster's Third New International Dictionary 1445 (1981). The parties gave substantial amounts to their church and donated, at least occasionally, to persons going on missionary trips. Paige now gives to missionary groups. We disagree with Ed's contention that Paige's new charitable spending represents a "completely different set of choices from those the family selected during the marriage." Further, the $125 charitable expense awarded to Paige was modest in comparison to the parties' significant ($1,600 per month) charitable contributions during the marriage. Given our deferential standard of review, we do not firmly believe that the motion court erred in allowing Paige this relatively modest charitable expense.

### 3. Food

■ Ed complains that Paige's expenses for food rose dramatically following the dissolution. In the original dissolution proceedings, Paige's income-and-expense statement listed a monthly food expense of $313.65. During the modification proceedings a few years later, the food expense on Paige's income-and-expense statement totaled $700. During the modification trial, Paige attributed that increase to her

choice to dine out more frequently and to eat organic foods. Ed believes Paige's monthly food expense should be closer to his ($376.29 per month). We again note that the motion court carefully and thoroughly reviewed this expense and reduced Paige's reasonable need for food by 17%, from $700 to $583 per month. The record shows that the motion court reasonably exercised its broad discretion by reducing Paige's reasonable monthly food expense. We do not firmly believe the motion court's decision was unreasonable.

### 4. Medical Expense

■ In her statement of income and expenses, Paige claimed $300 per month in "Medical Care, Dental Care, and Drugs." The motion court agreed and allowed $300. We again note that statements of income and expenses are routinely admitted and relied upon without any further testimony or documentary support for an individual item, unless the amounts are disputed, the party seeking maintenance concedes a lack of knowledge about the claimed expenses, and the party testifies inconsistently as to the amounts claimed. Brooks, 957 S.W.2d at 788.

Ed asserts that Paige had a $1,200 yearly out-of-pocket maximum under her health insurance; thus, a reasonable monthly expense could be no more than $ 100 ($1,200 divided by 12 months). Ed conveniently ignores Paige's consistent testimony disputing his contention that her out-of-pocket maximum was only $1,200. Paige repeatedly insisted her out-of-pocket maximum was $4,600 per year, and that she had paid more than $1,200 out of pocket in 2015. The motion court properly considered this evidence.

Our record contains a schedule of medical benefits for 2015 admitted into evidence with Paige's other employment records as part of Ed's Exhibit 2. The relevant portion of that schedule sets out Paige's annual deductible and out-of-pocket maximum:

| | Choice Plus | | |
|---|---|---|---|
| | BJC Facilities | Cigna Network | Non-Network |
| Annual Deductible | $200 | $600 | $3,000 |
| Annual Out-of-Pocket Maximum | $1,200 | $4,600 | Unlimited |

Ed claims that Paige never needed to seek care outside a BJC facility; thus, her deductible was $200, and her annual out-of-pocket maximum was $1,200 ($100 monthly). Paige acknowledged that she had not been to a hospital outside of Mis-souri Baptist (a BJC hospital) in 2015; however, she also testified that, as of September 2015, she had paid over $1,600 towards her $4,600 in-network out-of-pocket maximum.[12] In giving this testimony, Paige relied on Exhibit Z, which was an

---

**12.** While we cannot be sure, it is possible that Paige obtained medical care from in-network Cigna providers not affiliated with BJC. The record contains no evidence that Paige did not receive medical care at a non-BJC facility, only that she had not been to a hospital outside of the BJC system. Common sense sug-gests that medical care is not obtained solely at hospitals, and more notably, routine medical and preventive care is often provided in a non-hospital setting, e.g., a physician's office. This result would align with the Cigna-network out-of-pocket maximum of $4,600.

explanation of benefits from Cigna dated September 23, 2015. Paige testified that Exhibit Z accurately reflected her out-of-pocket maximum.[13]

The motion court was confronted with this conflicting evidence. Based on Paige's prior medical history and her current insurance policy, what amount was reasonable to budget for medical expenses? Relying on Paige's income-and-expense statement and her testimony of her out-of-pocket maximum, the motion court determined that $300 per month (or $3,600 annually) was just and reasonable. We are not firmly convinced, on our record, that the motion court erred in allowing this amount.

### 5. Home Improvement

■ Paige claimed $533.50 per month for home repairs, as evidenced by her prior spending. Paige testified that she completed major repairs on the home, including the replacing the furnace and the hot-water heater, a few years prior to trial. Further, Paige explained that her home required a major repair to address a basement that leaked and allowed water to enter whenever it rained. The motion court asked, "[I]s it reasonable to plan for home repairs and plan it in your budget, if you're going to have to fix things around your house over time?" Paige replied, "Yes." In the judgment, the motion court mostly agreed with Paige that the expense was reasonable, but reduced the home-improvement expense to $500.

Ed contends that the expense for home improvement should be lower because the furnace and hot-water-heater repairs were one-time "capital" expenses unlikely to re-cur. We agree that it is doubtful that those exact expenses will recur in the near future—that is, the need for a new furnace or hot-water heater. But the record contains testimony that Paige's basement leaked and needed major repair. Furthermore, Paige still owned the home, and it seems almost unnecessary to acknowledge that homes frequently require repairs, some of which may be expensive. In requesting an expense for home improvement based on historical expenses, Paige was not claiming that those exact home-improvement expenses would recur. Instead, Paige was requesting an amount based on past expenses to budget for future home-improvement expenses.

The motion court credited Paige with home-improvement expenses. We are not persuaded that the motion court abused its wide discretion in doing so.

### 6. Student Loans

■ Paige reported $200 per month in student-loan payments on her income-and-expense statement. The motion court found that this expense was reasonable. Ed asserts that the only evidence of Paige's student-loan payment was a statement from Paige's creditor stating that Paige was only obligated to pay $123.52 per month. Ed is correct: even Paige agreed in her testimony that her minimum payment was $123.52 per month. But the record is equally clear that Paige testified that she *actually* paid $200 per month to reduce her loan principal, and that she has consistently made payments of $200 throughout the duration of her loan. Given the wide discretion afforded to the motion court, we are unwilling to find this expense

13. Our transcript reflects that Exhibit Z was admitted at trial. Ed did not include Exhibit Z in our record, despite his obligation to compile the relevant record. Finch v. Finch, 442 S.W.3d 209, 218 (Mo. App. W.D. 2014). Ac-cordingly, we cannot review the exhibit. However, Ed's post-trial motion acknowledged that Exhibit Z reflected a deductible of $600 and payments of $1,648 towards Paige's $4,600 in-network out of pocket maximum.

unreasonable. Further, Ed cites no authority supporting his claim that a reasonable expense must only include the required minimum payment on a loan.

Legitimate (and indeed financially responsible) reasons exist to pay more than the required minimum payment, such as lowering the principal balance to reduce the interest charges that accrue. The motion court was tasked with determining if the $200 per month payment was just and reasonable in light of all relevant circumstances. The motion court accepted Paige's $200 per month figure.[14] This decision was within the motion court's broad discretion; we do not firmly believe that the motion court erred.

### 7. Gifts

 On her statement of income and expenses, Paige included monthly expenses of $125 in gifts for others and $250 in gifts for her children. Paige explained that she gave gifts to friends and family for graduations, weddings, Christmas presents, and birthdays. The motion court reduced Paige's monthly gift expense to $300 total—$100 in gifts for others and $200 in gifts for the children.

Ed claims that the motion court abused its discretion by including $300 per month in gifts as a reasonable expense. Ed opines that $300 per month is unreasonable and cannot be supported as a reasonable need. Ed acknowledges that the motion court did not err in allowing any reasonable expenses for gifts; instead, he merely asserts that a "reduced figure" of $150 per month is more reasonable. Ed does not explain how he arrived at this reduced figure. Furthermore, this $150-per-month figure is raised for the first time on appeal. At trial, Ed asserted that Paige should gift no more than $50 per month to others, or 1%

of her gross income (as calculated by Ed). The motion court rejected this argument at trial, and Ed has amended his reasonable amount for gift expenses to $150 on appeal.

Ed has failed to sustain his burden of proving that the motion court abused its discretion by allowing Paige $300 per month in gift expenses, rather than his suggested amount of $150 per month. Whether we would have awarded $300 to support Paige's gift giving is not at issue. We will not replace the motion court's estimation of reasonableness with our own on appeal. Our conclusion is reinforced by Ed's failure to explain why $150 per month is more reasonable. We do not firmly believe that the motion court lacked careful consideration of this expense or erred in allowing $300 per month in gift expenses.

### 8. Barber and Beauty

 In his unrelenting quest to dispute nearly every finding made by the motion court in its judgment, Ed complains that the motion court erred in awarding Paige $105 per month for barber-and-beauty expenses. Ed asserts that Paige failed to explain why this expense increased from $40 per month at the time of dissolution. We remind Ed of Paige's testimony that a friend, who operated a beauty salon out of her house, used to do her hair. That friend, Paige explained, no longer worked at home, so Paige was required to find a new hair salon. The motion court found Paige's testimony credible and determined this amount to be reasonable. Again, while the motion court may have been within its discretion to allow Paige a lesser amount as a reasonable expense, we cannot justify reversing the motion court's finding that Paige's barber-and-beauty expense was

---

**14.** Had the motion court limited Paige's expense to her monthly minimum payment, we

would have been similarly challenged to find an abuse of discretion.

just and reasonable. If we were to reverse, we simply would be substituting our sense of reasonableness for that of the motion court following a fact-intensive inquiry. We do not firmly believe that the motion court erred in allowing $105 per month as a reasonable expense for barber and beauty.

### 9. Automobile Insurance

■■■ The motion court included $97 per month for automobile insurance as an allowable expense for Paige. This figure [15] corresponded to the amount claimed in Paige's first statement of income and expenses, before Paige amended it.[16] Paige, however, amended the income-and-expense statement and claimed that she needed only $54 per month for automobile insurance. Paige also testified that she only paid $54 per month. The motion court offers no explanation as to why it chose the higher figure in its calculation of expenses, which even Paige admitted was too much. Further, on appeal, Paige does not defend the motion court's decision. As such, we firmly believe that the motion court's allowance of $97 per month for automobile insurance was erroneous.

### 10. Lawn Service

■■■ Ed asserts that he could find no transactions in Paige's records relating to lawn care. Paige testified at trial that she paid for lawn-care services with cash. Thus, Ed claims that the motion court erred in finding that Paige had reasonable expenses of $200 in cash transactions *and*

$72 for lawn care: Ed maintains that the lawn-care expense was necessarily included in the category for cash transactions.

The heart of Ed's argument is a factual dispute. Did Paige duplicate these transactions? Paige's statement of income and expenses included separate categories: one for cash expenditures ($200) and one for lawn-care services ($72). Paige testified that she paid $72 in cash for lawn care. Paige also described the components of the cash category as paying for small things, like getting coffee, eating out on the run, and paying for meals at the cafeteria where she works.[17] Paige did *not* admit that she duplicated her lawn-care expense. The record before us does not compel such a conclusion. Further, Ed's analysis of Paige's transactions included only transactions from her bank accounts and credit cards. Ed provides no proof that Paige repeated these expenses in her statement of income and expenses, but only speculates that Paige duplicated her lawn-care expense because she paid in cash and she also claimed a separate cash-expenditure category. Other than Paige's testimony, we have no way of knowing how Paige acquired and spent cash. By adopting Paige's version of expenses, the motion court believed, as a matter of credibility, that Paige spent $72 per month on lawn care and an additional $200 per month in miscellaneous cash transactions. See Hughes, 505 S.W.3d at 467 (we defer to the motion court's credibility determinations). Given

---

15. Again, the amount at issue here, standing alone, is de minimis in light of the modified maintenance award and the totality of the circumstances. Given the broad discretion afforded to the motion court in matters of determining maintenance, we would be reluctant to reverse the judgement of the motion court on the basis of this minor singular expense.

16. Ed points us to his Exhibit 16A to support this claim that Paige included $97 on her first statement of income and expenses. Best we can tell, Exhibit 16A is not in our record. In any event, our record does not support an allowance of $97 per month for automobile insurance.

17. Apparently, these expenses were also distinct from Paige's food category—Ed makes no argument to the contrary.

the record before us, we are not firmly convinced that the motion court erred by allowing both expenses.

## 11. Conclusion

After reviewing the list of reasonable expenses found by the motion court and contested by Ed, we find only two expenses that constituted an abuse of discretion: the $9 per month for life-insurance premiums and the $97 per month for automobile insurance. To the extent that the proceeds of Paige's life-insurance policy are payable to the parties' children, the motion court erred in allowing any expense for life-insurance premiums. Further, Paige attested, in her amended statement of income and expenses for the modification proceeding, that she only spent $54 per month for automobile insurance (a difference of $43). Thus, on remand, the motion court should subtract $43 from Paige's reasonable monthly expenses, and shall deduct an additional $9 if Paige's children continue as the beneficiaries under her life-insurance policy. Point One is granted in part.

## D. Point Two—Shift-Differential Income

■ We now move from expenses to income—the second part of the maintenance calculation. The motion court heard evidence in this modification trial over three hearing dates that were spread out over several months.

When trial started, Paige was employed as a nurse at Children's Hospital. Paige earned $21.6275 per hour and normally worked three 12-hour shifts per week. Paige also worked additional overtime and on-call shifts at Children's. Paige rotated between day and night shifts every six weeks. Paige would earn extra pay, in addition to her base hourly rate, for working shift differentials. The extra hourly pay was provided for working for non-traditional business hours (which includes night shifts). The differential amount was based on the type of shift worked.

Between the second and third day of trial, Paige accepted a new job at Missouri Baptist, another BJC-owned hospital. Paige testified that she found it challenging to rotate between day and night shifts at Children's Hospital. The hours in the new position were Monday through Friday, from 10:30 A.M. to 7:00 P.M., for 40 hours per week with breaks excluded. Paige explained that she was on-call once per week and one weekend every six weeks. Paige testified that she did not have all the documents detailing her compensation in the new position, but she knew her $21.6275 base hourly rate would be the same. Paige also stated that, while she would continue to receive shift differentials and overtime pay, the amount or frequency of the shift differentials was questionable. Paige testified that the shift-differential pay would "not be anywhere near" the amount in her old position because she would no longer regularly work night shifts.

In calculating Paige's monthly gross income, the motion court multiplied Paige's known hourly rate ($21.6275) by her hours per week (40). Ed asserts that the motion court's calculation of gross income was against the weight of the evidence because it did not account for the shift differentials that Paige would earn in her new position.

■ Ed's argument fails because any shift differentials that Paige might earn in her new position were speculative at the time of trial. A maintenance award cannot be based on a speculative future condition. Angel v. Angel, 356 S.W.3d 357, 364 (Mo. App. W.D. 2011). "A future income source should not be considered if the amount of the future income is speculative." Blount v. Blount, 674 S.W.2d 612,

614 (Mo. App. E.D. 1984). If Paige had not changed her job, the motion court could have—and should have—considered her past shift differentials in estimating her future income. Such a calculation would have been based on actual evidence of her past work history in that job.

But the record is clear that Paige changed jobs, during the dissolution hearing, and she was uncertain as to what shift differentials she would earn in her new position. Applying shift differentials in calculating Paige's future income would constitute rank speculation given the lack of definitive evidence of any shift-differential rate or the number of shift-differential hours Paige would work in her new job. Further, the record shows that the motion court agreed with Paige's assertion that she would receive far fewer shift-differential hours in her new position because her new position consisted primarily of weekday daytime hours instead of working night shifts and weekends. We find no basis for assigning error to the motion court's exercise of discretion.

Ed counters that Paige testified she would continue to receive differential pay at her new position; that she testified on cross-examination that she would receive four hours each day of evening shift differential; and that her evening shift differential at her old position was $2.40 per hour over her base rate. Thus, Ed argues that including shift differential pay is not speculative because Paige knows she will receive four hours of differential per day at $2.40 extra per hour.

We are not persuaded that the record definitively demonstrates that Paige routinely would receive four hours per day of evening shift differential pay. On cross-examination, Ed's counsel asked, "So your job starts at 10:30 in the morning, and the even[ing] shift differential starts at 3:00 p.m. so you'll receive four hours each day

of evening differential; correct?" Although Paige answered, "Correct," she previously testified that she was not sure what time the evening differential started at her new job. Paige further explained that the only occasion she would work nights and earn a shift differential was when she was on call (once per week for emergency surgeries and every sixth weekend). Given Paige's contradictory testimony, it was, at best, unclear whether she would actually receive four hours each day of evening differential at her new job.

Ed also asks us to speculate that Paige would receive $2.40 per hour in evening shift differential at her new job. This rate was the evening shift differential at her previous job. Ed speculates that, because Paige was receiving the same base hourly rate at her new job, she would also receive the same evening differential. Ed makes this claim despite testimony that Paige did not know the amount of the shift-differential rates. Ed presented no evidence of the shift-differential rates at Missouri Baptist nor are we aware of any other evidence in the record suggesting Paige would earn the same shift-differential rates at Missouri Baptist that she earned at Children's.

Because we will not require the motion court to speculate about the number and value of Paige's future shift-differential hours, the motion court's calculation of Paige's gross income based only on her base hourly rate was not against the weight of the evidence. Further, Ed could have requested a continuance at trial to seek additional evidence regarding Paige's new employment. In the end, Ed bore the burden to provide "detailed evidence" of Paige's income to allow the motion court to make a reasoned finding. See Greenberg, 454 S.W.3d at 394. Should income from Paige's shift-differential pay comprise a significant portion of Paige's future in-

come, Ed has the option of again seeking a modification of the maintenance award based upon a substantial change in circumstances. Point Two is denied.

### E. Points Three and Four—Erroneous Tax Calculations

These points on appeal are premised in part upon the motion court's misapplication of the law and in part upon an argument based on the weight of the evidence. Ed argues that the motion court misapplied the tax law by improperly calculating Paige's net income using 34% tax rate and by improperly calculating Paige's taxes on maintenance. We agree. The record demonstrates that the motion court was mistaken as to certain facts which caused it to misapply the law in three respects: (1) the judgment effectively requires Ed to unlawfully pay Paige's voluntary 401(k) contribution; (2) the judgment included Paige's medical-insurance premiums as part of its tax obligation calculation; and (3) the motion court miscalculated Paige's taxes on maintenance. We will address these errors in turn.

### 1. 401(k) Contributions

As a matter of law, voluntary 401 (k) contributions may not be deducted from net income when determining maintenance. Muenz v. Muenz, 99 S.W.3d 4, 8 (Mo. App. E.D. 2002). The purpose of maintenance is to bridge the gap between a spouse's income and reasonable expenses, such that the spouse can get by. Dowell, 203 S.W.3d at 285. Requiring an obligor spouse to contribute to the obligee spouse's retirement fund would facilitate the building of capital and would conflict with the bridge-the-gap purpose of maintenance. McKown, 280 S.W.3d at 174.

Here, the motion court accepted Paige's testimony that she generally took home 66% of her gross income as net income at Children's Hospital. Thus, after calculating Paige's gross income to be $3,750 per month at her new position at Missouri Baptist, the motion court concluded that her net income was $2,474 per month (approximately 66% of $3,750). The motion court attributed the balance to Paige's tax withholdings. This calculation caused a misapplication of the law.

Paige derived the 66%-net-income (or 34%-tax-rate) figure by relying on her statement of income and expenses at trial, which was submitted with data from her pay at Children's Hospital. The statement of income and expenses listed her gross wages as $1,952.63 per pay period and her net take home pay as $1,288.53. The full calculation follows:

| | |
|---|---|
| **Gross Wages Per Pay Period** | **$1,952.63** |
| F.I.C.A. Tax | -$114.23 |
| Federal Tax | -$239.45 |
| State Tax | -$64.79 |
| City Earnings Tax | -$17.64 |
| Medical Insurance | -$113.50 |
| Dental Insurance | -$4.22 |
| Vision Insurance | -$5.44 |
| Medicare | -$26.72 |
| 401(k) | -$78.11 |
| **Net Income Per Pay Period** | **$1,288.53** |

Thus, Paige correctly calculated that $1,288.53 is approximately 66% of $1,952.63. Ed, however, notes that the statement of income and expenses includes $78.11 per pay period in 401(k) deductions.

In calculating Paige's net income (or, after-tax income), the motion court did not distinguish Paige's 401 (k) contribution from her tax withholdings, thereby allowing Paige to reduce her net income by the amount of the voluntary 401 (k) deduction. This calculation increased Paige's shortfall between her income and expenses, which correspondingly increased Ed's maintenance obligation. Effectively, the motion court ordered Ed to contribute to Paige's 401(k) retirement plan. As a matter of law, Ed cannot be required to make this contribution. Muenz, 99 S.W.3d at 8.

While Paige recognizes that voluntary 401(k) contributions may not be deducted from net income in calculating maintenance, she maintains that the record does not reflect that her 401(k) contributions were voluntary. Paige is wrong. Ed's Exhibit 2 contains Paige's employment records and includes a letter from the retirement specialist at BJC HealthCare. The letter states, "BJC HealthCare also sponsors a 401(k) plan ... to which employees

can contribute." (Emphasis added.) Further, another page in Exhibit 2 specifically noted that Paige elected to contribute 4% of her salary to her 401(k) on a pre-tax basis.

Accordingly, the motion court, by applying a 34% tax rate to calculate Paige's net income and Paige's corresponding tax liability, effectively required Ed to pay for Paige's voluntary 401(k) contributions. Requiring Ed to contribute to Paige's 401(k) was an erroneous misapplication of the law.

### 2. Health-insurance Premiums

■ Ed's claim of error with regard to health insurance is similar to his claim relating to the 401(k) contribution. As shown in the table in the previous section, the motion court implicitly allowed Paige to reduce her net income—through the use of the 66% calculation in figuring net income—by the amount of her premiums for medical insurance ($113.50), dental insurance ($4.22), and vision insurance ($5.44). Ed does not dispute that premiums for health insurance are allowable as reasonable expenses in calculating maintenance, but notes that the motion court previously included these health insurance premiums

of $160 per month when calculating Paige's monthly expenses. Thus, the motion court allowed Paige to "double dip" her medical insurance premiums, by both reducing her net income and by increasing her expenses by this amount. Such a calculation is erroneous as a matter of law—Ed cannot be required to pay twice for Paige's health-insurance premiums. See Henbest v. Henbest, 164 S.W.3d 198, 201 (Mo. App. S.D. 2005) (wife admitted, and the Southern District recognized, that duplicated expenses for health insurance were a mistake).

Paige admitted as much in her testimony at trial. Paige acknowledged that her statement of income and expenses contained both a payroll deduction for medical-insurance premiums through her employer and an expense for health insurance. Paige stated that this was a mistake, and that she was only claiming health-insurance premiums once. Nevertheless, the motion court included Paige's health insurance premiums twice; first by including them in the calculation of net income, and second by allowing them as a reasonable expense. Requiring Ed to pay for Paige's health-insurance premiums twice was erroneous as a matter of law.

### 3. Taxes on Maintenance

Ed also complains that the motion court misapplied the tax laws when calculating expenses relating to Paige's tax obligation on her modified maintenance award. As noted in our fact section, *supra*, the motion court calculated Paige's monthly net income as $2,474 and her monthly reasonable expenses as $4,399. Thus, Paige's monthly shortfall between her net income and her expenses was $1,925. In its judgment, the motion court found it "in the interests of justice" that the maintenance amount also include the "estimated tax

[Paige] will have to pay on only the maintenance she receives." In calculating the tax on maintenance, the motion court reasoned:

Paige's gross annual income from her BJC employment in the surgical department is $44,985.20 ($21.6275 x 40 hours per week x 52 weeks). [Paige's] annual shortfall is $23,098.00. The total of these amounts puts [Paige] in the 25% federal tax bracket. The total federal tax is $17,020.80. The total Missouri tax at 6% is $4,085.00. Based on review of [Paige's] Statement of Income and Expenses and her 2014 tax return, the Court finds that [Paige's] total annual tax on the maintenance is $6,768.00, or $564 per month. The estimated monthly amount for tax on maintenance is added to the monthly amount of maintenance. Therefore, [Paige] will receive $2,489.00 per month [the $1,925 shortfall plus the $564 in "taxes on maintenance"] as and for modifiable maintenance from [Ed] pursuant to this Judgment of Modification.

We first note that the calculations in the first part of this paragraph—the "total" federal and state taxes of $17,020.80 and $4,085, respectively—appear to bear no relation to the "total annual tax on the maintenance" of $6,768. So, while the motion court appears to have erroneously applied flat, rather than marginal, tax rates for federal (25%) and state (6%) taxes, we will ignore those erroneous calculations. We simply cannot discern any relationship between those "total" taxes and the "taxes on the maintenance" in the motion court's analysis.

As for the motion court's finding that $564 per month in taxes on the modified maintenance award was reasonable, the record shows that the motion court relied on Paige's statement of income and expenses and her *2014* tax return. Paige's statement of income and expenses lists an

expense of $564.83 for "Taxes on Maintenance." The corresponding footnote to that amount states, "Estimate based on *2014* Federal Income Tax Return: $4,561.00 Federal Income Taxes and $2,217.00 Missouri Income Taxes." (Emphasis added.) Hence, the $564 figure that the motion court relied on was taken from Paige's tax returns in 2014.

Notably, in 2014, Paige received $4,444 per month ($53,328 per year) in maintenance payments. Paige paid an effective tax rate on maintenance of approximately 12.7% in 2014 ($564 per month in taxes divided by $4,444 per month in maintenance). However, the motion court recognized that Paige's annual shortfall, which necessitated maintenance, was now only $23,098 (roughly, her new monthly shortfall of $1,925 times 12 months [18]). The motion court offered no explanation as to why the taxes on maintenance are the same now as they were in 2014, when Paige is receiving roughly half the amount of maintenance as she did in 2014. The motion court's finding that Paige would incur $564 per month in "taxes on maintenance" has no basis in the record, is against the weight of the evidence, and is erroneous as a matter of law.

### 4. Ed is Not Precluded from Challenging the Motion Court's Tax Calculations

 Paige argues that we should disregard the motion court's miscalculation of her tax liability because Ed provided the motion court with no evidence about taxes. First, we note that the motion court is presumed to know the tax law. Sturgeon v. Sturgeon, 849 S.W.2d 171, 176 (Mo. App. E.D. 1993). Paige offers two cases, Linton v. Linton, 117 S.W.3d 198 (Mo. App. S.D. 2003), and Keller v. Keller, 877 S.W.2d 192 (Mo. App. E.D. 1994), neither of which supports her argument.

Importantly, in both cases, the trial court did not consider any tax consequences in the determination of maintenance. In Linton, the trial court used income from Wife's IRA as part of the funds available to meet her reasonable needs. 117 S.W.3d at 206. On appeal, Wife complained that the trial court failed to take into account tax penalties on early withdrawals from IRAs before retirement. Id. The Southern District affirmed because Wife presented no evidence on tax implications at trial, so Wife could not argue on appeal that the trial court did not consider taxes. Id. Similarly, in Keller, Husband stopped making maintenance payments under the parties' separation agreement, and Wife ordered an execution and garnishment on Husband's bank account. 877 S.W.2d at 194. The trial court sustained Husband's motion to quash the garnishment action. Id. In doing so, the trial court found that Wife had income from the sale of the marital home, resulting in a reduction of the maintenance amount under the parties' separation agreement. Id. On appeal, Wife complained that the motion court failed to consider the tax consequences of her selling marital home. Id. at 196. This Court noted that the trial court was not advised of any tax ramifications. Id. By not offering the trial court the opportunity to consider tax consequences, Wife could not complain on appeal. Id.

The matter before us is distinguishable from Linton and Keller because, unlike those cases, the motion court here expressly considered the tax consequences of the maintenance award when calculating

---

18. Inconsistent rounding led to dollar figures that were misstated by a few dollars in some places.

Paige's income and expenses. We acknowledge that Ed did not present evidence of any tax liability. Had the motion court completely ignored the issue of taxes, Ed could not complain now on appeal that the motion court should have considered taxes. But the motion court voluntarily made a finding on Paige's tax obligation on the maintenance she was to receive, and awarded that tax obligation to Paige as part of the modified maintenance award. Once the motion court voluntarily made a finding of Paige's tax obligation a part of its judgment, it assumed the burden of correctly applying the tax law. See Sturgeon, 849 S.W.2d at 176.

Accordingly, by misapplying the law and improperly treating Paige's 401(k) contribution and health-insurance premiums as tax withholdings when calculating Paige's net income, the motion court required Ed to pay for expenses to which Paige was not lawfully entitled. This error was further compounded when the motion court miscalculated Paige's tax obligation for the modified maintenance award based upon taxes Paige paid in 2014. Accordingly, the motion court's tax calculations were unsupported by substantial evidence and erroneous as a matter of law. Points Three and Four are granted.

### F. Paige's Overarching Argument—Correct Result for the Wrong Reason

Acknowledging arguendo that the motion court erred in some of its calculations, Paige asserts that the judgment nevertheless should be affirmed as the correct result, even if the motion court gave wrong or insufficient reasons.

Paige's argument goes substantially as follows: The motion court found that Ed paid $4,444 per month for maintenance and that the parties originally imputed gross income to Paige of $2,500 per month. The motion court also found that Paige's gross income at the time of the modification trial was $3,750 per month. Thus, Paige contends, the only change in circumstances was Paige's increase in income (from $2,500 imputed to $3,750 actual per month, gross). While Paige's gross income increased by $1,250 over her imputed income, the motion court reduced maintenance by $1,955, resulting in a $705 windfall to Ed. Paige argues in her brief that "the [motion] court could have easily reduced Paige's maintenance by the amount of her increased income, $1,250.00."

Paige's argument, however, presupposes that one "correct" result exists. Her argument also ignores the motion court's discretion to review changes in expenses once a determination is made that a substantial change in circumstances exists. The motion court possibly could have simply compared Paige's imputed income to her current income, and reduced maintenance accordingly. Had the motion court so ruled, we might have found such an award to be within the motion court's broad discretion, But was this approach a "correct" result, such that we should affirm the motion court's judgment as the right result based on the wrong reasons? To so hold, we would need to conclude that modifying Paige's maintenance award based solely upon her income differential *was just and reasonable in light of all the relevant circumstances of this case.* See Hammer, 139 S.W.3d at 245. As previously noted, we accord the motion court substantial deference in determining this issue precisely because the issue is so fact intensive. We are unwilling to hold, on a cold appellate record, that another method of modifying maintenance—not employed by the motion court—necessarily would have been just and reasonable in light of all the circumstances of this case.

In this case, we endeavored to defer, to the extent possible, to the motion court's superior opportunity to judge the reason-

ableness of the motion to modify maintenance. We remain unconvinced that only one "correct" result exists that requires affirming the judgment despite the motion court's errors. To the contrary, a range of reasonable approaches was available to the motion court to resolve the issues presented in the motion to modify. The record amply demonstrates that the motion court gave diligent and careful consideration to the many issues presented. We have deferred to the motion court's approach while simply correcting a few clear mistakes.

## II. Point Five—Attorney's Fees

Ed's final point asserts that the motion court abused its discretion in awarding Paige $10,000 in attorney's fees incurred during the modification proceedings. Ed notes that the motion court allowed the modified maintenance amount to be retroactive for three months before the judgment was issued, rather than for the entire duration of the modification proceedings. The motion court's retroactivity decision allowed a windfall to Paige, which, Ed reasons, provided Paige ample funds to pay her attorney's fees.

### A. Standard of Review

In a modification proceeding, we review the motion court's decision to award attorney's fees for an abuse of discretion. Bryant v. Bryant, 351 S.W.3d 681, 691 (Mo. App. E.D. 2011). An abuse of discretion occurs when the award was "so arbitrary and unreasonable and against the logic of the circumstances as to shock the sense of justice and indicate that the trial court did not carefully consider its decision." Id. While the party requesting attorney's fees initially bears the burden of proving his or her entitlement to those fees, on appeal, we presume the award was correct and the appellant bears the burden to prove otherwise. Id.

### B. No Abuse of Discretion

As a general matter, parties in a domestic-relations case bear the cost of their own attorneys. In re Marriage of Brown, 310 S.W.3d 754, 758 (Mo. App. E.D. 2010). Section 452.355.1, however, allows a motion court to award attorney's fees and costs after considering "all relevant factors including [1] the financial resources of both parties, [2] the merits of the case and [3] the actions of the parties during the pendency of the action." The motion court is considered an expert on the necessity, reasonableness, and value of attorney's fees. Alabach v. Alabach, 485 S.W.3d 386, 388 (Mo. App. E.D. 2016).

Relying on the bill submitted by Paige's attorney, the motion court found that Paige incurred a total of $26,214.98 in attorney's fees and costs to defend against Ed's motion to modify. The motion court expressly considered the financial resources of the parties. The motion court found that Ed's ability to pay was not at issue: he was a vice president at a company, and he earns $240,000 annually in salary plus a yearly bonus of approximately $118,000. In the same judgment, the motion court determined that Paige could not meet her reasonable needs, despite her current full-time employment. Further, the motion court found that Ed's actions and approach to the motion to modify increased the cost of litigation, as Ed brought Paige to court and his "extremely detailed analysis of [Paige's] spending patterns, over a four year period, did add to the costs of the litigation for both parties and [Paige] was forced to bear some of those costs, without an ability to mitigate her costs [and] attorney's fees."

We note that Ed's challenges were not wholly without justification. The motion court found certain factors in favor of Ed. Recognizing that Ed succeeded in his mo-

tion to modify, the motion court found that Ed's action had merit. Although, the motion court applied the maintenance modification retroactively for only three months prior to the judgment, the motion court expressly considered the retroactivity date of the judgment when awarding attorney's fees. The motion court found that Paige was able to utilize the excess maintenance she had been receiving throughout the litigation to pay her attorney's fees. Thus, while finding that Paige incurred $26,214.98 in costs and attorney's fees to defend the motion to modify, the motion court required Ed to pay only $10,000.

The motion court's analysis and the award of attorney's fees in an amount substantially less than the attorney's fees incurred by Paige persuades us that the motion court carefully considered its decision when awarding such fees. See Bryant, 351 S.W.3d at 691. Given our review of the record, and the determined and uncompromising manner in which this appeal was litigated, one might opine that the motion court was generous in limiting the award to $10,000, and that the attorneys' fees incurred by both parties might have been substantially reduced had the parties worked as diligently to mutually resolve the maintenance issue as they did to undermine each other's positions both in the motion proceedings and on appeal. We are not persuaded that the motion court's decision was so arbitrary and unreasonable as to shock our sense of justice. Id. Hence, the award of attorney's fees was well within the motion court's broad discretion. Point Five is denied.

## Conclusion

The judgment of the motion court is affirmed in part and reversed in part. On remand, the motion court is directed to re-calculate the award of maintenance consistent with this opinion. The motion court should reconsider any amount for Paige's life-insurance premiums that benefit the parties' children. Further, the motion court should allow only $54 per month for automobile-insurance premiums. The motion court should also properly apply the law: Ed should not be required to contribute to Paige's 401(k) plan, he should not be required to pay twice for Paige's health-insurance premiums, and he should be required to pay only a reasonable amount for Paige's tax obligation on her current modified maintenance. The remainder of the motion court's judgment is affirmed.

James M. Dowd, P.J., concurs.

Gary M. Gaertner, Jr., J., concurs in part and dissents in part.

Gary M. Gaertner, Jr., Judge, dissenting.

I respectfully dissent as to the life insurance issue only. The majority opinion states that because the children are the beneficiaries of the life insurance policy the proceeds from the policy do not provide a benefit to Paige, but I disagree. Paige testified that the policy was for the "children to take care of whatever needed to be taken care of when I die and not have worries about funeral costs or estate costs." Unlike in In re Marriage of Boston, 104 S.W.3d 825, 832 (Mo. App. S.D. 2003), and McAvinew v. McAvinew, 733 S.W.2d 816 (Mo. App. W.D. 1987), the record here established that Paige did not intend for the life insurance policy to support or benefit her children after her death, but she intended it to pay for her funeral and estate costs.[1] Knowing that she has arranged for a dignified funeral for herself

---

1. The record is silent to the face value of the policy; however, from the de minimis monthly payments of $9, we can presume the policy itself is likely also small.

provides Paige a tangible benefit during her lifetime.[2]

Because the benefit went to Paige, the policy was in effect part of maintenance. As the majority opinion notes, express posthumous maintenance is allowed. Section 452.370.2 ("[u]nless otherwise agreed in writing or expressly provided in the degree, the obligation to pay future statutory maintenance is terminated upon the death of either party"); McAvinew, 733 S.W.2d at 818-19.

This Court will sustain the trial court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. Murphy v. Carron, 536 S.W.2d 30 (Mo. banc 1976). However, "[o]ur review of maintenance awards is extremely constrained." Hileman v. Hileman, 909 S.W.2d 675, 679 (Mo. App. E.D. 1995). Trial courts have broad discretion over maintenance awards, and we will find an abuse of that discretion only where the award is "patently unwarranted." Id. In light of the *de minimis* nature of the monthly payments combined with the trial court's considerable discretion in determining the amount of maintenance, I would not find an abuse of discretion by the trial court's inclusion of the $9 per month for Paige's life insurance policy that she expressly intended to cover her funeral expenses.[3]

Under our abuse-of-discretion standard, we do not find an abuse of discretion if reasonable persons can differ about the propriety of the action taken by the trial court. Hughes v. Hughes, 505 S.W.3d 458, 467 (Mo. App. E.D. 2016). Such a reasonable difference exists here: the majority opinion interprets Paige's life insurance policy as for the benefit of the children alone and thus in effect to be child support under the guise of maintenance, while I consider the life insurance policy—per Paige's stated intention—as providing a benefit not for her children but to Paige by paying for her funeral. Under this standard of review, this Court should not supplant its views for that of the trial court. Even the majority opinion notes in footnote 9 that were this the only error, it alone would not be a sufficient basis for reversal, suggesting that reasonable minds could differ.

Because the facts here can reasonably support the trial court's finding that Paige's reasonable needs for the purpose of maintenance included the monthly payments for her life insurance policy, I see neither an abuse of discretion nor a misapplication of the law.

For the foregoing reasons, I respectfully dissent in part.

---

**2.** We recognize there was evidence in the record that Paige was a practicing Catholic and thus the provisions for her body upon her death have added religious importance.

**3.** Moreover, I believe there lies a larger public policy in encouraging individuals to leave provisions covering the costs attendant with their burials, so, in the event the family is unable to carry the cost of a burial, that burden does not fall upon the government.